THE NICHOLAS COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83726. Filed June 18, 1962.

*John W. Lyons, Esq.*, for the petitioner.
*George H. Becker, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in the income taxes of the petitioner corporation for the calendar years and in amounts as follows:

| Year | Deficiency |
|------|-----------|
| 1955 | $5,544.93 |
| 1956 | 5,336.31 |
| 1957 | 1,412.09 |

As will be hereinafter shown, a proprietorship in the business of serving as a broker for manufacturers of food products and kindred items, was incorporated—the resultant corporation being the petitioner herein—and the proprietor was elected president. Three questions are presented for decision:

(1) Whether, in the circumstances here presented, the petitioner could properly deduct as current operating expenses, the amounts which it treated as "salary" to its president in 1955 and 1956, and paid to certain nonemployees who were designated by said president to receive the same.

(2) Whether petitioner could properly deduct as current operating expenses, amounts paid to the former proprietor as so-called "lease expense," which allegedly constituted consideration for: (a) Petitioner being allowed to represent as a broker, the manufacturers which the proprietor had represented previous to the incorporation of petitioner; (b) use of the name "Nicholas"; and (c) the proprietor's covenant not to compete.

(3) Whether amounts which petitioner paid to the widow of a former food broker, pursuant to a contract which petitioner took over from the predecessor proprietorship—under which the proprietor had agreed to pay the widow specified amounts as the "purchase price" of all of her right, title, and interest in and to brokerage agreements which her deceased husband had with certain manufacturers—are deductible as current operating expenses.

A further issue relating to the allowability of net operating loss carryback deductions will be governed by our decisions on the three questions enumerated above.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts and the exhibits identified therein, are incorporated herein by reference.

The petitioner, Nicholas Company, Inc., is an Indiana corporation, having its principal office in Indianapolis, Indiana. It filed a Federal income tax return for each of the taxable calendar years 1955, 1956,

and 1957 here involved, with the district director of internal revenue at Indianapolis.

The petitioner corporation operates what is known as a food brokerage business. It succeeded on June 30, 1953, under circumstances presently to be described, to such a business which had theretofore been operated as a proprietorship, known as the Ralph F. Nicholas Company.

A description of the food brokerage business of the previous Nicholas proprietorship is as follows. Ralph Nicholas, the proprietor (hereinafter called Ralph), had contractural agreements to represent a number of manufacturers[1] of food products and other staple items sold in grocery stores and drugstores. Ralph had employed several salesmen; and he and these salesmen called on wholesale grocers and the headquarter offices of grocery and drugstore chains to solicit orders for products manufactured by the proprietorship's principals. In addition to soliciting orders, Ralph and the salesmen also worked with their customers in planning advertising and other sales promotion activities. For the services which he and his employees rendered, Ralph's proprietorship was paid a commission by the principals, based upon the dollar volume of sales which developed from the orders which he and the salesmen secured on behalf of such principals.

Some of the agreements between the proprietorship and the principals were in writing; while the others were oral. Such agreements were terminable at the will of either party thereto, upon 1, 30, or 60 days' notice. The agreements defined the territory in which the proprietorship was to function as a broker; and this territory comprised approximately 30 counties across the central section of Indiana, together with two towns in Illinois, just over the western border of Indiana.

The record in the instant case is silent as to exactly how many principals were represented by Ralph's proprietorship, and as to how and when most of such relationships originated; but it does reveal that four of such principals had been taken over from an individual named Nita Boone, in the following circumstances. Nita Boone was the widow of H. S. (Dan) Boone who, until his death in March 1952, had operated a food brokerage proprietorship in Indianapolis. Nita attempted for a short time after her husband's death to operate the business; but she was not successful. The result was that four of the principals represented by the Boone proprietorship, approached Ralph and asked him to make some arrangement with Nita whereby

---

[1] Manufacturers which are represented by brokers, such as petitioner and the Nicholas proprietorship, are called in the trade parlance, "principals." We shall, for simplicity, herein refer to such manufacturers by that term.

he could take over their accounts and represent them. Following negotiations between Ralph and Nita looking to such an arrangement, she and he entered into a contract in May 1952, the here material provisions of which were as follows:

AND WHEREAS, said surviving widow [Nita], who now is unable to carry on said business, is desirous of selling and transferring all of her right, title, and interest in and to the following brokerage accounts * * * [four companies named], unto Ralph F. Nicholas.

2. Now, THEREFORE, the said Ralph F. Nicholas hereby agrees to purchase the right to represent and sell the aforesaid accounts from said decedent's widow for the total purchase price of Twenty-five Thousand Dollars ($25,000.00), payable at the rate of Five Thousand Dollars ($5,000.00) per year hereafter.

Shortly after execution of the foregoing instrument, two of the principals mentioned therein entered into new written brokerage agreements with Ralph; and the other two made new verbal brokerage agreements with him.

Ralph had engaged in the food brokerage business for quite a number of years prior to 1953. However, in 1952 he began to give consideration to retiring from the business; and he also began to spend most of his time away from the business and outside the State of Indiana. While Ralph was away, he left the business in charge of his son-in-law, Stanley Cederquist (hereinafter called Stanley), who had been associated with the proprietorship since 1946.

During the late spring or early summer of 1953, Ralph and Stanley had a series of conferences or conversations on the subject of conducting the brokerage business in corporate form. It was ultimately agreed that this would be done; and the result was that the petitioner corporation was formed on or about June 30, 1953. It had 1,000 shares of no-par-value common stock, of which 600 shares were issued, outstanding, and held as follows:

| Shareholder | Number of shares held |
|---|---|
| Ralph F. Nicholas | 1 |
| Stanley Cederquist | 300 |
| Eleanor Cederquist [1] | 299 |

[1] Only child of Ralph Nicholas, and the wife of Stanley Cederquist.

At or about the same time that the petitioner corporation was formed, an instrument entitled "Agreement" was entered into, the parties to which were the petitioner, and Ralph Nicholas (as proprietor of the Ralph F. Nicholas Co.), and Stanley Cederquist. The portions of said agreement which are here pertinent are as follows:

WHEREAS, the said Ralph F. Nicholas Co., a broker of nationally known food products for many years last past, is now desirous of becoming a corporation consisting of the present owner, Ralph F. Nicholas, the present general manager, Stanley G. Cedarquist [sic], and such other necessary parties.

AND WHEREAS, it is now agreed by and between the parties hereto that for and in consideration of the transfer of all right, title and interest in and to the

tangible and intangible assets of the Ralph F. Nicholas Co. unto The Nicholas Co., Inc., the said Nicholas Co., Inc., agrees to perform in the future, if able, the following stipulated conditions:

1. In consideration of the transfer of all of the aforesaid assets to said corporation Ralph F. Nicholas shall receive one (1) share of stock in said corporation and shall serve as president of said corporation for a period of five years, with option to renew said services for a further period of five years.

2. The said Ralph F. Nicholas is to perform the duties of said president and to act at all times for the success of The Nicholas Co., Inc.; his salary therefor is to be the sum of $450.00 per month, and the further sum of 6.6% of annual gross brokerage income of The Nicholas Co., Inc., computed annually, or $550.00 per month guaranteed. This charge or extra income is to be considered as "lease expense" for the duration of this contract.

Ralph turned in approximately $2,600 worth of furniture and fixtures to the petitioner on or about July 1, 1953. The petitioner corporation has continued since that date to operate the food brokerage business in the same manner as the proprietorship had been operating prior to incorporation.

The record herein is silent on the mechanics of petitioner's takeover of the brokerage agreements being serviced by the proprietorship. However, it is clear that petitioner did take over such agreements. A comparison of the list of petitioner's principals on January 1, 1954, with the list of its principals on December 31, 1957 (the last of the taxable years here involved), reveals that 11 of the 29 principals represented by petitioner on January 1, 1954, were no longer being represented by it on December 31, 1957; and that 8 of the 26 principals represented by petitioner on December 31, 1957, had not been represented by petitioner on January 1, 1954.

Management and direction of petitioner's operations, at all times since incorporation, has been handled by Stanley, rather than by Ralph. Although Ralph was the elected president of the petitioner from July 1953 to June 1956, he had very little, if anything, to do with its operations. He has not resided in Indiana since June 1953. Apparently he had lived since that time in Florida and other Southern States; and he had been in Indiana only infrequently—on short visits of 2 or 3 days' duration. During the taxable years 1955 and 1956, he occasionally held telephone conversations with Stanley, some of which were of a personal nature dealing with family matters.

During 1956, Ralph and Stanley (the latter acting on behalf of the petitioner) decided to rescind the above-mentioned and quoted agreement of June 30, 1953, and to replace the same with a new agreement. Accordingly on December 12, 1956 (but effective as of June 1, 1956), an instrument entitled "Agreement" was entered into by and between Ralph and the petitioner—the here pertinent introductory provisions of which are as follows:

WHEREAS, on June 30, 1953, First Party [Ralph] and Second Party [petitioner corporation] entered into a certain Written Agreement for the lease, purchase

and/or sale of the interest of First Party to Second Party of all of First Party's interest in and to the Ralph Nicholas Co. and the Nicholas Co. Inc. [*sic*]; and

WHEREAS, First Party and Second Party desire and intend to rescind, cancel and forever end said written agreement, dated June 30, 1953, in all respects and substitute therefore [*sic*] this Agreement; and

WHEREAS, it is the desire and intent of the parties that First Party shall sell, transfer, set over and deliver to Second Party all of First Party's right, title, equity and interest in and to the tangible and intangible assets of the Ralph F. Nicholas Company for the consideration hereinafter stated:

Now, THEREFORE, In consideration of the premises, the mutual convenants herein contained, and each act done pursuant thereto by either of the Parties, such parties hereby enter into the following articles of agreement.

The substance of the undertakings of the parties in this new agreement were as follows. First, Ralph agreed to resign all offices which he held in the petitioner corporation; to turn over for cancellation his 1 share of stock; to "sell, transfer, set over and deliver" to the petitioner all of his interest in both the proprietorship and in the petitioner corporation itself (including "all of the physical assets, real or personal or mixed, tangible and intangible, of every kind and description and wheresoever located"); and not to compete with petitioner in the food brokerage business in Indiana for a period of 5 years. Second, petitioner corporation agreed to pay: (a) $500 monthly for 5 years to Ralph's divorced former wife; (b) $750 monthly for 3 years to Ralph directly; and (c) $125 monthly to Ralph directly, for the 2 years immediately following the previous 3 years.

Following the execution of the foregoing agreement, Ralph resigned his position of president; and he turned in the 1 share of stock which he had received at the time of petitioner's organization. Stanley was thereupon elected president of the petitioner corporation.

Under and pursuant to the provisions of the foregoing agreements of 1953 and 1956, petitioner paid the following amounts during the taxable years here involved:

| Year | On Ralph's behalf as "salary" | To Ralph's divorced wife | To Ralph as "lease expense" | To Nita Boone | Totals |
|---|---|---|---|---|---|
| 1955 | $5,400 | | [3] $6,983.34 | $5,000 | $17,383.34 |
| 1956 | 2,700 | $3,500 | [4] 3,747.61 | 5,000 | 14,947.61 |
| 1957 | | 6,000 | [5] 1,307.70 | 2,500 | 9,807.70 |
| Totals | [1] 8,100 | [2] 9,500 | 12,038.65 | [6] 12,500 | 42,138.65 |

[1] Paid pursuant to agreement of June 30, 1953, and deducted on the returns as "compensation to officers."
[2] Paid pursuant to agreement of December 12, 1956, and deducted on the returns as part of a miscellaneous expense called "lease expense."
[3] Paid pursuant to agreement of June 30, 1953, and deducted on the return as part of "lease expense."
[4] Paid in part pursuant to June 30, 1953, agreement, and in part to December 12, 1956, agreement—entire sum included in "lease expense" deduction on the return.
[5] Paid pursuant to agreement of December 12, 1956, and deducted on the return as part of "lease expense."
[6] Paid pursuant to the Nita Boone-Ralph F. Nicholas agreement of May 1952, and deducted on the returns as part of "lease expense."

The amounts listed in the above table as "salary" payments for 1955 and 1956, at the rate of $450 per month, were actually paid for

nursing home facilities and medical care for Ralph's divorced former wife; and they were equal to the amounts which Ralph, in a divorce settlement, had agreed to pay to his former wife for her support and maintenance.

The respondent, in his statutory notice of deficiency, disallowed the deductions claimed by petitioner on its returns for 1955, 1956, and 1957, for "compensation" (salary) paid on Ralph's behalf, and also for "lease expense."

## OPINION.

1. We take up first the so-called "salary" payments which petitioner paid at Ralph's direction, to his divorced former wife during 1955 and 1956. Petitioner's position under this issue is that Ralph was its president; that it was bound by the June 1953 contract to pay him a "salary" of $450 per month; that it did pay Ralph such amount for 12 months in 1955 and for 6 months in 1956, or until the June 1953 agreement was supplanted by the December 1956 agreement; and that Ralph actually performed services, as the petitioner's president, which were commensurate with the amounts of "salary" paid.

We are convinced, however, that the sum and substance of the agreement of June 1953 under which petitioner took over the business of the proprietorship, was a sale by Ralph to the petitioner of all of the proprietorship's assets, tangible and intangible; and that the payments of "salary" (as well as the "lease expense" payments, called for by paragraph 2 of the June 30, 1953, agreement) were actually paid as consideration for such assets. The agreement of June 30, 1953, explicitly stated that there was to be a "transfer of all right, title and interest in and to the tangible and intangible assets" of the proprietorship, to the petitioner. The recited consideration for such assets was 1 share of no-par-value common stock, and "employment" of Ralph for 5 years, as petitioner's president. It is not realistic, however, to conclude that the 1 share of stock and the mere *agreement* to employ Ralph was what petitioner really paid for those assets. Rather, we believe, as we have already stated, that the actual consideration to Ralph for the assets and going business of his proprietorship, was the monetary payments—designated as "salary" and as "lease expense." The salary payments were, therefore, of a capital nature; and they are not deductible as current operating expenses.

Moreover, it is clear that Ralph, although he was the elected president of the petitioner, did not perform any services that would have justified the payment on his behalf of the $5,400 in 1955, and $2,700 for one-half year's "services" in 1956. Petitioner has strained mightily to paint a picture of Ralph's rendering valuable services to it during 1955 and 1956; but the most that it has been able to show

is that he conferred on the telephone an unspecified number of times with Stanley, who then was petitioner's vice president and general manager—and some of these calls related only to personal family matters. Furthermore, Ralph resided outside the State of Indiana continuously after June 1953; and from the evidence it would appear that he spent most of his time in Florida and other Southern States. He came to Indiana only on infrequent visits of short duration, after the last-mentioned date; and it is not even certain that these visits occurred in 1955 or 1956. Thus, even if the disputed payments were in fact for Ralph's services, no more than a minuscule portion of said payments could qualify under section 162(a)(1) as *reasonable* allowance for salaries * * * for personal services *actually rendered.* (Emphasis supplied.) Since we are convinced that the payments were not compensatory in nature, it is not necessary to fix any amount that would represent compensation to Ralph, by application of the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540.

We hold that the deductions claimed by petitioner on its 1955 and 1956 returns for the amounts paid to Ralph as so-called "salary," were properly disallowed by the respondent.

2. Turning next to the so-called "lease expense" payments, we note that these fall into three principal categories. First, there are the payments made to petitioner directly, pursuant to the June 1953 agreement, in an amount equal to 6.6 percent of petitioner's gross income from brokerage. Second, there are the payments made partially to Ralph directly, and partially on his behalf to his divorced former wife, pursuant to the December 1956 agreement. And third, there are the payments to Nita Boone, the obligation for which arose under the May 1952 agreement wherein Ralph undertook to purchase all of Nita's right, title, and interest in and to four brokerage agreements with manufacturer-principals. The record indicates that petitioner took over Ralph's liability for the payments to Nita under said May 1952 agreement. There is no dispute that petitioner did pay Nita $5,000 in each of the years 1955 and 1956, and $2,500 in 1957. We shall now consider these three categories in the order stated.

As regards the first category—the payments of 6.6 percent of gross brokerage income which were paid to Ralph pursuant to the June 1953 agreement—petitioner contends that these were paid to Ralph for his lease of "his good-will, his name, his contacts, and his physical presence to the corporation for a period of five years." This contention is without merit. We have already held in the first issue, that the June 1953 transaction was a sale of all the proprietorship's assets; and we mentioned there, and here hold, that the "lease expense" payments (i.e., 6.6 percent of gross brokerage income) were part of the consideration for the proprietorship's assets. The right

to the use of the name "Nicholas," the proprietorship's goodwill, and Ralph's contacts with manufacturer-principals, were all part and parcel of the assets of the proprietorship's going business which petitioner purchased.

As regards the second category—the payments made to Ralph and to his divorced wife pursuant to the December 1956 agreement—we are convinced that these were of the same character as the "salary" and "lease expense" payments made under the June 1953 agreement. The later December 1956 agreement represented merely a revision of the earlier agreement, substituting the payment scheme under the 1956 agreement for that which had theretofore prevailed under the 1953 agreement—with the addition of a covenant on Ralph's part not to compete.

Petitioner's argument is, that it actually paid these amounts for the covenant not to compete. But we are convinced that such covenant not to compete was mere window dressing, designed to lay the basis for petitioner to claim as a current operating expense deduction, what actually were capital expenditures in buying out a proprietorship. Ralph, in reality, had left Indiana and the Midwest, permanently. Petitioner needed no covenant from him in order to protect itself from his competition. Moreover, even if there were some substance to petitioner's contention that it was paying Ralph not to compete, the evidence is not sufficient to permit any separation of the amounts paid to him, between portions allocable to the covenant not to compete and other portions allocable to the price paid for the assets of the proprietorship. See, in this connection, *Toledo Blade Co.*, 11 T.C. 1079, affirmed per curiam 180 F. 2d 357 (C.A. 6); and *Aaron Michaels*, 12 T.C. 17.

Finally, we pass to that portion of the "lease expense" payments which were made to Nita Boone. These payments are not only the third category of "lease expense" payments above mentioned, but they also are the basis for one of the issues mentioned in our preliminary statement. The May 1952 agreement between Ralph and Nita, by its own terms, provided that Ralph's payments thereunder were to be the "purchase price" of all of Nita's right, title, and interest in four brokerage agreements. The payments so made—first as made by Ralph, and then by petitioner—were thus capital expenditures, and not current operating expenses. See, in this connection, *Anchor Cleaning Service, Inc.*, 22 T.C. 1029; *Thrifticheck Service Corporation*, 33 T.C. 1038, affd. 287 F. 2d 1 (C.A. 2); and *Richard M. Boe*, 35 T.C. 720.

We sustain the respondent's disallowance of petitioner's deduction of all "lease expense" payments for each of the years 1955, 1956, and 1957.

As we have heretofore stated, the allowability of net operating loss carryback deductions is dependent upon our decisions on the issues involving the "salary" and "lease expense" payments. In the light of our above holdings on these issues, we hold that the respondent properly disallowed net operating loss carryback deductions.

*Decision will be entered for the respondent.*

