ANTHONY YELENCSICS AND NORMA YELENCSICS, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2078–77—2080–77,    Filed September 29, 1980.
2223–77, 2224–77.

*Bernard Sobelsohn, Benjamin Weiner,* and *Jack N. Honart,* for the petitioners.

*Robert B. Marino,* for the respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Steve Yelencsics and Rose Yelencsics, docket No. 2079–77; Joseph Yelencsics and Margaret Yelencsics, docket No. 2080–77; John V. Rawson and Mabel Rawson, docket No. 2224–77; Rawson Cadillac, Inc., formerly Laing Motor Car Co., docket No. 2223–77.

WILES, *Judge:* Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes:

| Petitioner | Docket No. | Taxable year | Deficiency | Sec. 6653(a)[2] addition to tax |
|---|---|---|---|---|
| Anthony Yelencsics | 2078–77 | 1967 | $9,365.77 | |
| and Norma Yelencsics | | 1968 | 3,146.59 | |
| | | 1969 | 4,920.63 | |
| Steve Yelencsics | 2079–77 | 1967 | 7,820.08 | |
| and Rose Yelencsics | | 1968 | 4,790.31 | |
| | | 1969 | 6,193.46 | |
| Joseph Yelencsics and | 2080–77 | 1967 | 7,049.71 | |
| Margaret Yelencsics | | 1968 | 3,664.59 | |
| | | 1969 | 6,291.27 | |
| John V. Rawson and | 2224–77 | 1967 | 36,296.97 | $1,814.85 |
| Mabel Rawson | | 1968 | 11,270.10 | 563.51 |
| | | 1969 | 17,988.24 | 899.41 |
| Rawson Cadillac, Inc. (formerly Laing Motor Car Co.) | 2223–77 | 1969 | 14,900.70 | 745.04 |

After concessions, the remaining issues for decision are:

(1) Whether payments made by petitioner Rawson Cadillac, Inc., formerly Laing Motor Car Co., to Gordon Laing pursuant to a consulting agreement are deductible as compensation under section 162(a), or are constructive dividends to the individual petitioners.

(2) Whether certain payments by Rawson Cadillac, Inc., to Gordon Laing in partial satisfaction of notes issued him on the sale of his stock constitute constructive dividends to the individual petitioners.

(3) Whether the section 6653(a) addition to tax should be imposed on petitioners Rawson Cadillac, Inc., and John V. Rawson.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Anthony Yelencsics and Norma Yelencsics, husband and wife, resided in Edison, N.J., when they filed their

---

[2]All stautory references are to the Internal Revenue Code of 1954 as amended.

1967, 1968, and 1969 joint Federal income tax returns with the Internal Revenue Service, Philadelphia, Pa., and when they filed their petition in this case.

Petitioners Steve Yelencsics and Rose Yelencsics, husband and wife, resided in Edison, N.J., when they filed their 1967, 1968, and 1969 joint Federal income tax returns with the Internal Revenue Service, Philadelphia, Pa., and when they filed their petition in this case.

Petitioners Joseph Yelencsics and Margaret Yelencsics, husband and wife, resided in Edison, N.J., when they filed their 1967, 1968, and 1969 joint Federal income tax returns with the Internal Revenue Service, Newark, N.J., and when they filed their petition in this case.

Petitioners John V. Rawson and Mabel Rawson, husband and wife, resided in Watchung, N.J., when they filed their 1967, 1968, and 1969 joint Federal income tax returns with the Internal Revenue Service, Newark, N.J., and when they filed their petition in this case.

Petitioner Rawson Cadillac, Inc., formerly Laing Motor Car Co., a corporation organized under the laws of the State of New Jersey, maintained its principal offices in Plainfield, N.J., when it filed its petition in this case. It filed Federal corporate income tax returns for the years 1967, 1968, and 1969 with the Internal Revenue Service, Newark, N.J.

Laing Motor Car Co. (hereinafter the corporation) was incorporated under the name "Laing Machine-Auto Repair Co." on July 19, 1905, by Allen B. Laing, who held 98 of the 100 shares issued. Upon the death of Allen Laing in 1961, his son Gordon continued the business as president and majority shareholder.

During the years 1967, 1968, and 1969, the corporation was a franchised dealer of the General Motors Corp. (hereinafter General Motors) with the exclusive right to sell Oldsmobile and Cadillac automobiles in Plainfield, N.J. At that time, the corporation operated under a dealer selling agreement with General Motors effective through October 1970. This agreement, at paragraph 3 thereof, provided that General Motors entered into the contract with the corporation in reliance upon, and in consideration of, the personal qualifications and representations of Gordon M. Laing (hereinafter Laing). No other person was listed in the agreement as owning or actively participating in the operation of the corporation. The agreement further provided

that no change in ownership, financial interest, or active management of the corporation shall be made without the prior written approval of General Motors.

On August 31, 1964, the corporation borrowed $175,000 from the General Motors Acceptance Corp. (hereinafter GMAC) and executed a mortgage to GMAC on eight parcels of land located in Plainfield, N.J. As further security for this loan, Laing pledged 1249 shares of common stock of the corporation to GMAC. From 1966 through 1969, the 1249 shares of stock were held in escrow.

From late 1960 through July 1966, petitioner John V. Rawson (hereinafter Rawson) was employed by the corporation as sales manager of its automobile dealership. In this capacity, Rawson's primary responsibility was running the sales department and he generally was not involved in any of the other aspects of the business.

Sometime prior to July 22, 1966, Laing told Rawson that he wanted to sell the business and offered Rawson the opportunity to purchase his stock interest in the corporation. The financial condition of the corporation had been deteriorating for some time and Laing was anxious to sell.

On July 22, 1966, following negotiations between the parties, Rawson entered into an agreement (hereinafter referred to as the stock purchase agreement) to purchase all the issued and outstanding stock of the corporation (1251 shares) from Laing for $265,000.[3] Under the terms of this agreement, Laing was to receive payment for his stock as follows: $75,000 upon closing, $70,000 on January 15, 1967, and the balance payable over 8 years beginning January 15, 1967, in 96 equal monthly installments of $1,519.20 (consisting of principal and interest at 5 percent per annum). The agreement included the following provision for securing payment of the unpaid purchase price:

5. Buyer agrees to secure the Seller for the payment of all unpaid amounts at closing of title by executing promissory notes for the payment thereof according to the terms of this agreement, which said notes shall be made by Rawson and by Anthony Yelencsics, Steve Yelencsics and Joseph Yelencsics, and their wives as guarantors, and further guaranteed by Laing Motor Car Co. All guarantors shall be liable as co-makers. * * *

---

[3] As of May 31, 1966, the net worth of the corporation per its books was $261,056.31.

In addition to the foregoing collateral security, all shares of stock of Laing Motor Car Co. shall be held in escrow by Walter L. Leib, Esq., attorney for Rawson. He may release said shares starting January 16, 1967 in a number and amount and ratio as the amount paid bears to the original total obligation on said date.

The stock purchase agreement required Laing, at closing, to provide Rawson with all unpledged stock certificates, properly endorsed in blank, and stock powers for all certificates pledged with GMAC. For purposes of this agreement, the stock powers were the equivalent of the stock certificates representing the pledged shares. Laing also agreed to sign all documents necessary for transferring the pledged certificates to Rawson upon their release by GMAC and to arrange for such transferred certificates to be recorded on the corporate books under Rawson's name.

Rawson did not want General Motors to know that he had purchased all of Laing's stock since he feared that they would terminate the automobile franchise. Accordingly, he required Laing to maintain secrecy with respect to the stock purchase agreement. As an additional measure designed to insure this secrecy, the agreement further provided that 25 percent of Laing's stock was to be held nominally of record in his name endorsed in blank.[4]

As part of the agreement, Laing agreed to remain as president of the corporation at the pleasure of the board of directors and as a director of the corporation at the pleasure of the stockholders. However, resignation of all other officers and directors of the corporation was to be delivered to Rawson at closing. Laing also agreed to attend all meetings of the board of directors and any other meetings and conferences requested of him by the board of directors, or as requested, to give an appropriate proxy to vote his shares of stock at any stockholders meeting and to vote his place at a board of directors meeting. In addition, he agreed not to own or operate a Cadillac or Oldsmobile dealership within 50 miles of Plainfield, N.J., for 5 years.

The following consulting arrangement was also provided for in the agreement:

---

[4]General Motors had a policy requiring its dealers to own at least 25 percent of the stock in the corporation holding the franchise. By adding this nominal ownership provision, Laing's name remained on par. 3 of the dealer selling agreement despite the sale of his entire interest.

6. Laing shall be employed by Laing Motor Car Co. for a period for four years for a total salary of $70,000 to be payable as follows: during the year 1966, in equal monthly installments, the sum of $10,000.00 to begin August 15, 1966; during the year 1967, in equal monthly installments, the sum of $20,000.00; during the year 1968, in equal monthly installments, the sum of $20,000.00; and during the year 1969, in equal monthly installments, the sum of $20,000.00; * * *

Laing shall not be required to devote any prescribed hours in performance of any duties in connection with such employment in order to be entitled to receive the sums herein mentioned at the time herein mentioned, but all of such sums shall be considered as earned in return for consulting services and advice to Laing Motor Car Co., which shall be given from time to time and shall be payable to the heirs and assigns of Laing should he die or become disabled during the term of such consulting contract.

During the term of this employment contract and for as long as any amounts were still due him under the stock purchase agreement, Laing had unlimited access to and right to examine all corporate books and records.

The agreement also prohibited Laing and Rawson from doing anything to adversely affect the dealership agreement between General Motors and the corporation so long as any amounts due Laing remained unpaid. If the Cadillac selling agreement should be terminated or transferred to Rawson, the agreement specified that, at Laing's option, any unpaid amounts would become immediately due and payable.

The stock purchase agreement between Laing and Rawson was signed by them and approved by Laing on behalf of the corporation. Since Rawson lacked financial resources of his own, the entire $75,000 due Laing at or before the closing was paid by Anthony Yelencsics, Joseph Yelencsics, and Steve Yelencsics (hereinafter referred to as the Yelencsics group) pursuant to a previous arrangement between those individuals and Rawson. Closing of title was consummated on July 22, 1966.

Immediately following execution of the stock purchase agreement, a $35,000 promissory note and a $120,000 promissory note were executed and delivered to Laing in accordance with that agreement.[5] The pertinent portions of those two notes follow:

---

[5]The stock purchase agreement called for the execution of three promissory notes, two for $35,000 and one for $120,000. The record indicates, however, that only one of the $35,000 notes was actually executed.

For value received, the undersigned do jointly and severally promise to pay to the order of

> Gordon M. Laing
> residing at Washington Rock Road, Watchung,
> New Jersey,

the sum of * * * with interest thereon from * * * at the rate of five (5%) per cent per annum on the unpaid balance until fully paid.

The notes were signed by Rawson and his wife, the Yelencsics group and their respective wives, and by Laing, on behalf of the corporation.

Also on July 22, 1966, a separate agreement entitled "Shareholders' Partnership and Buy and Sell Agreement" (hereinafter referred to as the shareholders' agreement) was executed between Rawson and the Yelencsics group. This agreement acknowledged that Rawson had purchased all the issued and outstanding stock of the corporation on that same date from Laing, referred to as the "former owner" thereof, with funds provided by the Yelencsics group. Moreover, in accordance with a prearranged plan between Rawson and the Yelencsics group to transfer 75 percent of such stock to the latter, the agreement provided, in part, as follows:

> 1. The First Party [Rawson] assigns all his right title and interest in all the issued and outstanding stock in Laing Motor Car Co. pursuant to the contract between Rawson and Laing and the closing of title, all of which were executed and finalized on July 22, 1966 to himself and the Second Party [Yelencsics Group] so that each individual shall have and continue to have title to 25 percent of the issued and outstanding stock of Laing Motor Car Co.
>
> 2. The Second Party [Yelencsics Group] shall have the sole right at their pleasure to determine the method of transfer of stock to them and in what proportion and ratio and further, in the event it is deemed advisable by them, they may place their shares of stock in the name of Stephen Yelencsics, as nominal or owner ·of record, who will represent them as an officer of the corporation and on the Board of Directors * * *

The shareholders' agreement further provided that Rawson was to be the general manager in charge of operating the business with complete authority to hire and fire employees. However, all profits, dividends, bonuses, and the like arising from the operation and management of the corporation, including the sale of its assets, were to be divided among the individual owners in accordance with their respective percentages of stock ownership. The parties also agreed to utilize their best efforts to arrange for the names of Rawson and Stephen Yelencsics to be

designated as transferees in paragraph 3 of the dealer selling agreement between the corporation and General Motors. As a first step towards achieving that objective, they further agreed to pay off the outstanding balance of the 1964 loan from GMAC to the corporation and effect a release of the pledged stock. Once released, the stock would be delivered to Rawson's attorney, Walter L. Leib, to be held in escrow for eventual distribution in accordance with the terms of the stock purchase agreement.

The shareholders' agreement also provided that the board of directors of the corporation consist of Laing, Rawson, and Stephen Yelencsics and that the officers be Laing (president), Rawson (vice president and secretary), and Stephen Yelencsics (treasurer). In addition, all corporate checks were to be signed by both Rawson and Laing until such time as Laing was replaced in paragraph 3 of the dealer selling agreement.

At a special meeting of the stockholders of the corporation, held July 22, 1966, the new stockholders, Rawson and the Yelencsics group, accepted the resignation of all former directors of the corporation, except for Laing, and elected Rawson, Laing, and Stephen Yelencsics as new directors to serve for 1 year. They also ratified the stock purchase agreement and the shareholders' agreement executed that same day. These individuals continued to serve as directors of the corporation from 1967 through 1969.

At a special meeting of the board of directors of the corporation, held July 22, 1966, the newly elected directors accepted the resignation of all former officers of the corporation except for Laing, and elected Laing as president, Rawson as vice president and secretary, and Stephen Yelencsics as treasurer, for a 1-year term. These individuals continued to serve in their respective capacities from 1967 through 1969.

On August 16, 1967, Laing wrote letters to the Cadillac and Oldsmobile divisions of General Motors informing them that he intended to immediately transfer 30 percent of the stock of the corporation to Rawson, as a bonus, and to sell the remaining stock to Rawson within the next 5 years. Laing, therefore, requested that General Motors place Rawson's name in paragraph 3 of the dealer selling agreement alongside his own. On that same day, Rawson wrote letters to those two automobile divisions acknowledging Laing's letters and stating his intention to assume ownership of the corporation in the near future.

In a side agreement executed on August 16, 1967, Laing and Rawson agreed that their respective letters to General Motors would not affect or change the stock purchase agreement previously executed. Rawson and the Yelencsics group entered into a similar agreement that day with respect to their shareholders' agreement of July 22, 1966. Petitioners did not notify General Motors of the previous change in ownership of the corporation resulting from the stock purchase agreement and the shareholders' agreement.

Subsequent to his stock sale on July 22, 1966, and continuing throughout most of 1967, Laing rendered a variety of services to the corporation. While Rawson, as general manager, was primarily concerned with the sales department, Laing generally monitored the operation of the service, parts, and paint shop departments, and met with zone representatives from General Motors. Rawson also consulted with Laing at various times about company policy, particularly with respect to car allotments.

In 1968, Laing sold his house in New Jersey and moved to Jupiter, Fla. He permanently resided in Florida during 1968 and 1969. Following his move, Laing frequently communicated with Rawson by telephone to discuss car allotments and other company decisions. Rawson also went to Florida approximately once a month to confer with Laing in person concerning the business.

Beginning in August 1966, and continuing once a month thereafter, petitioner Joseph Yelencsics, on behalf of the Yelencsics group, received financial statements of the corporation from Rawson. He also met with Rawson on a weekly basis to review the financial status and operations of the business.

During the years 1967 through 1969, Laing was the record owner of 1,249 of the 1,251[6] outstanding shares of the corporation. On January 29, 1968, Rawson was issued a stock certificate representing 375 shares of the corporation. This transaction was not recorded on the stock transfer books of the corporation. No stock certificates were ever issued to the Yelencsics group from July 22, 1966, through December 31, 1969.

At a special board of directors meeting held on October 27, 1969, and a special meeting of the stockholders held on November 3, 1969, the name of the corporation was changed to Rawson Cadillac, Inc. On March 26, 1970, a new dealer selling agreement

---

[6]Robert McDonald and Betty R. Laing were each the record owners of 1 share of stock of the corporation.

became effective between Rawson Cadillac, Inc., and General Motors. Rawson's name replaced Laing's in paragraph 3 of that agreement.

In 1972, Rawson purchased all the stock of Rawson Cadillac, Inc., owned by the Yelencsics group. Rawson sold his interest in the business in 1975 at which time the unpaid balance on the $120,000 note was finally paid.

Pursuant to the consulting arrangement contained in the stock purchase agreement of July 22, 1966, the corporation paid Laing $20,000 during each of the years 1967, 1968, and 1969 and deducted those amounts on its corporate income tax returns for those years as "compensation of officers." During those same years, the corporation paid the following sums to Laing in partial satisfaction of the notes issued him on the sale of his stock.

| | |
|---|---|
| 1967 | $82,510.90 |
| 1968 | 13,122.90 |
| 1969 | 13,734.90 |

The foregoing payments by the corporation were made by check signed by Rawson and rubberstamped with Laing's signature.

From July 22, 1966, through December 31, 1969, petitioners John Rawson and the individual members of the Yelencsics group each owned a 25-percent stock interest in the corporation. Prior to the 1967 distributions to Laing, each had a basis in their stock of $66,250.

In his notice of deficiency issued to the corporation, respondent disallowed the corporation's claimed compensation deductions for amounts paid Laing in 1967, 1968, and 1969, concluding that these payments were not for services rendered, but were in substance, payments for Laing's stock in the corporation. Based upon his disallowance of the deduction for 1967, respondent further denied the corporation a net operating loss carryover deduction for 1969. Respondent also determined that part of the corporation's underpayment of tax for 1969 was due to negligence or intentional disregard of rules and regulations under section 6653(a).

In separate statutory notices issued to the individual petitioners, respondent determined that the payments made by the corporation to Laing during 1967, 1968, and 1969, both for consulting services and in partial satisfaction of the notes issued

him on the July 22, 1966, stock sale, were constructive dividends to Rawson and the Yelencsics group to the extent of the corporation's current and accumulated earnings and profits. For 1967, 1968, and 1969, respondent determined that the corporation had available earnings and profits to pay dividends in the amounts of $68,997.59, $21,515.47, and $42,396.79, respectively. Finally, respondent determined that part of Rawson's underpayment of tax for the years at issue was due to negligence or intentional disregard of rules and regulations under section 6653(a).

OPINION

We must decide the following issues:

(1) Whether payments made by petitioner Rawson Cadillac, Inc., formerly Laing Motor Car Co., to Gordon Laing pursuant to a consulting agreement are deductible as compensation under section 162(a), or are constructive dividends to the individual petitioners.

(2) Whether certain payments by Rawson Cadillac, Inc., to Gordon Laing in partial satisfaction of notes issued him on the sale of his stock constitute constructive dividends to the individual petitioners.

(3) Whether the section 6653(a) addition to tax should be imposed on petitioners Rawson Cadillac, Inc., and John V. Rawson.

*Issue 1*

The first issue for decision is whether payments by petitioner corporation to Laing during 1967, 1968, and 1969, pursuant to the consulting provision contained in the stock purchase agreement are deductible as ordinary and necessary business expenses under section 162(a)(1).[7] Petitioner argues that these payments represented compensation for services actually rendered by Laing and were properly deductible. Respondent contends that

---

[7]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

the consulting provision lacked economic reality, and therefore, the payments at issue were, in substance, nondeductible partial payments for Laing's stock in the corporation.

In evaluating the respective claims of the parties, we recognize that the substance of this transaction and not merely its form will control its treatment for Federal income tax purposes. Where, as here, respondent attacks the form of an agreement selected by a seller and buyer, this Court will examine its substance so that the operation of the tax laws will not be frustrated by the mere form in which the agreement is drawn. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). After a careful review of the record and for the reasons set forth below, we conclude that the substance of those payments comports with their formal characterization as compensation for consulting services.

To support his argument that the consulting provision was a mere sham, respondent emphasizes that this provision did not require Laing to perform any services to the entitled to payment and that the corporation was still obligated to make the payments to Laing's heirs and assigns even after his death. As additional support, respondent maintains that, in fact, Laing performed little or no consulting services during the years at issue.

Although we agree that Laing's right to receive payment under this provision was not contingent upon his performing specific services or devoting prescribed hours in a consulting capacity, we have found as a fact that he actually rendered various services in each of the years before us. For a period of approximately 2 years after he sold his stock, Laing generally monitored the operation of various departments of the business, leaving the sales end for Rawson's exclusive supervision. He often conferred with Rawson concerning company policy and also met with zone representatives from General Motors. Moreover, even after moving to Florida in 1968, Laing frequently communicated with Rawson by telephone and regularly met with him to discuss company business.

Respondent urges that we disregard these services, contending that they were nominal and only performed on a part-time basis. Aside from disagreeing with his conclusion as to the significance of Laing's services, it is clear that respondent has failed to distinguish between a consulting arrangement and a

normal employment contract between an employer and a full-time employee. The payments Laing received from the corporation were not for full-time services, but rather in consideration for his agreement to remain "available" to provide advisory and consulting services when needed. Such an agreement often accompanies the sale of an ongoing business. Considering Rawson's limited experience in managing the dealership and his express desire to prevent General Motors from learning about his stock purchase, it is completely understandable that he would want to retain Laing as a business consultant and also have him available to meet with zone representatives from General Motors to maintain the outward impression that Laing was still their dealer. In fact, we think that Rawson regarded Laing's services as so valuable that he was willing to commit the corporation to make payments for 4 years even if Laing should die or become disabled during that period. Although a payment-after-death clause, like the one before us, may legitimately arouse suspicion, we believe it to be immaterial in the context of the economic reality involved herein. See *Wager v. Commissioner*, 52 T.C. 416, 419 (1969).

We also note that the stock purchase agreement contained a covenant by Laing not to own or operate a competing Cadillac or Oldsmobile dealership within 50 miles of Plainfield, N.J., for 5 years. While this provision did not have a separately stated consideration, it did represent an additional commitment on Laing's part, supplemental to his consulting commitment, and it added value to the consideration for which the corporation was obligated in the consulting arrangement to pay annually.[8] Consequently, even if Laing had never been called upon to provide any consulting services, there was sufficient mutuality of consideration and economic reality to give substance to this consulting arrangement. See *Barrett v. Commissioner*, 58 T.C. 284, 289 (1972); *Wager v. Commissioner, supra*.

Finally, there is nothing in the record to suggest that the $265,000 Laing received for his stock was unduly low or that any portion of the consulting fees represented part of the purchase price for his stock. Cf. *Nicholas Co. v. Commissioner*, 38 T.C. 348 (1962). The financial condition of the corporation had been

---

[8]See *Muskogee Radiological Group, Inc. v. Commissioner*, T.C. Memo. 1978–490.

deteriorating for some time and a stock price which approximated the net worth of the corporation is certainly not unreasonable. Both the stock purchase price and the consulting fee schedule were arrived at by Laing and Rawson following arm's-length negotiations and were considered by them to be reasonable. Absent any evidence to the contrary, we will not disturb their judgment. Accordingly, we hold that the payments to Laing pursuant to the consulting arrangement were deductible by the corporation during the years at issue.[9] Since we find no underpayment of tax by the corporation in 1969, the corporation is not liable for the section 6653(a) negligence addition to tax. In view of this holding, we also reject respondent's contention that such payments were constructive dividends to Rawson and the Yelencsics group.

## Issue 2

The next issue for decision is whether payments by the corporation to Laing in partial satisfaction of the notes issued him for the sale of his stock are constructive dividends to petitioners Rawson and the Yelencsics group. Respondent contends that these payments were made on behalf of petitioners to pay for their purchase of Laing's stock and constitute constructive dividends to them to the extent of the earnings and profits of the corporation.[10] In support of his position, respondent cites us the following cases: *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947); *Ferro v. Commissioner*, 242 F.2d 838 (3d Cir. 1957), affirming a Memorandum Opinion of this Court; *Apschnikat v. United States*, 421 F.2d 910 (6th Cir. 1970). For the reasons set forth below, we agree with respondent.

Petitioners advance several arguments to avoid constructive

---

[9]Since respondent's determination with respect to the corporation's net operating loss carryover deduction for 1969 was based solely upon his disallowance of the compensation deduction in 1967, we further hold that the corporation is entitled to that net operating loss deduction.

[10]In his separate statutory notices mailed to petitioners, respondent has taken an inconsistent position by charging the Yelencsics group with ownership of 75 percent of the corporation and, at the same time, determining that Rawson owned 100 percent of the corporation during these years. On brief, however, respondent has conceded that if we find that Laing sold his stock in equal amounts to Rawson and the individual members of the Yelencsics group in a single transaction, then Rawson would only be subject to a constructive dividend based on 25-percent stock ownership of the corporation.

dividend treatment of these payments. Their first argument, as we understand it, is that no completed sale of the stock was made during the years at issue because Laing retained both legal and beneficial ownership of the shares. Accordingly, petitioners conclude that they were not shareholders[11] of the corporation from 1967 through 1969 and consequently cannot be charged with any dividends. We disagree.

For purposes of Federal income taxation, a sale occurs upon transferring sufficient incidents of beneficial ownership rather than technical requirements for the passage of title under State law. See *Maher v. Commissioner*, 55 T.C. 441, 451–452 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972); *Clodfelter v. Commissioner*, 48 T.C. 694 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). Beneficial ownership is marked by command over property or enjoyment of its economic benefits. *Anderson v. Commissioner*, 164 F.2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945). The retention by a seller of formal attributes of ownership does not preclude finding a sale. Cf. *Pacific Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972). Furthermore, in ascertaining the beneficial owner of stock, the substance of a sale transaction, and not merely its form, will control.

Guided by these principles, we are convinced that Laing sold his entire stock interest in the corporation to petitioners on July 22, 1966.[12] Contrary to their arguments on brief, the record clearly shows that petitioners possessed beneficial ownership of the stock beginning on July 22, 1966, and continuing throughout

---

[11]Sec. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its *shareholders*—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year * * *

[Emphasis supplied.]

[12]Objective indicia of a sale to petitioners on that date were as follows: (1) The sale price for the stock was definitely fixed and there was a significant downpayment made on that date. See *Clodfelter v. Commissioner*, 48 T.C. 694 (1967), affd. 426 F.2d 1391 (9th Cir. 1970); *Hay v. Commissioner*, 25 B.T.A. 96, 101 (1932); (2) written, enforceable promissory notes obligated petitioners on the purchase price. See *Maher v. Commissioner*, 55 T.C. 441, 451–452 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972); (3) the stock purchase agreement utilized the descriptive terms "buyer" and "seller" and the shareholders' agreement referred to Laing as the "former owner" of the stock. See *Clodfelter v. Commissioner, supra;* (4) in addition, both agreements were effective July 22, 1966, thereby fixing a specific date for recognition of the rights and obligations of the parties. *Clodfelter v. Commissioner, supra.*

the years at issue. Although Laing remained the owner of record during those years, petitioners held unqualified proxies to vote the stock and, in fact, exercised their voting rights at shareholder meetings. Petitioners also had control of the corporation since they constituted a majority of the board of directors and elected the officers. That Laing was president and a director of the corporation is not significant because he occupied those positions at the pleasure of petitioners. While it is true that Laing monitored the operations of various departments, he did so only as a consultant. Rawson, the general manager, was in charge of running the business and had principal decision-making authority. Furthermore, petitioners were entitled to all profits, dividends, and bonuses from the operation of the business, including proceeds from the sale of corporate assets. In addition, since, under the stock purchase agreements, all unpaid amounts were immediately due and payable in the event the dealer selling agreement was terminated or transferred to Rawson, petitioners, and not Laing, bore the risk of loss during these years.

Petitioners maintain, however, that Laing's continued equity interest was evidenced by his right to examine corporate books, sign checks, and the fact that his name alone appeared in paragraph 3 of the dealer selling agreement. We find petitioners' reliance on these facts misplaced.

Since the corporation also signed on the notes to Laing, his right to examine corporate books and records was merely a security measure to ensure that the corporation had sufficient funds in the event Laing turned to it for payment. It was not, as petitioners suggest, a significant restriction on their stock ownership. In addition, although the shareholders' agreement required Laing's signature on all checks, we have found as a fact that those checks were actually signed by Rawson and only rubberstamped with Laing's signature. Hence, Laing's control over corporate moneys was illusory.

The fact that Laing remained the dealer of record does not affect our holding that petitioners were the beneficial owners of the stock. There is nothing in the stock purchase agreement which conditioned the sale upon placing their names in the dealer selling agreement. Based on the letters and agreements of August 16, 1967, we are convinced that petitioners considered the stock purchase agreement as effecting a completed sale despite the fact that no change had yet been made in the

franchise agreement. Laing continued to be the dealer of record merely to protect the secrecy of the stock purchase agreement. While General Motors apparently believed him to be the actual owner, all incidents of ownership had passed to petitioners on July 22, 1966.

As an alternative argument, the Yelencsics group assert that they were not shareholders because no stock certificates were ever issued to them. This contention is without merit.

On the facts before us, it is clear that the stock certificates were not physically transferred to the Yelencsics group because they were already pledged with GMAC as collateral for a previous loan to the corporation. Under the terms of the stock purchase agreement, however, petitioners received stock powers for those pledged certificates which were treated as the equivalent of the certificates themselves. In any event, we note that stock certificates are merely documentary evidence of corporate ownership and, therefore, their issuance and delivery to a purchaser is not a prerequisite to ownership of the shares represented by such certificates. *Morgan v. Commissioner*, 46 T.C. 878, 890 (1966). Since petitioners were certainly the beneficial owners of stock during the years 1967 through 1969, their first argument must fail.

We now turn to petitioners' second principal contention. Before doing so, however, it is first necessary to consider the applicable law governing constructive dividends.

It is well settled that if a corporation pays an obligation of its shareholder or makes a payment for his benefit, such payment may constitute a constructive dividend to that shareholder to the extent of available earnings and profits. *Wall v. United States, supra; Smith v. Commissioner*, 70 T.C. 651, 668 (1978); *Sachs v. Commissioner*, 32 T.C. 815, 820 (1959), affd. 277 F.2d 879, 882 (8th Cir. 1960), cert. denied 364 U.S. 833 (1960). That the formalities of a dividend are lacking or that the distribution is not recorded on the corporate books, as such, is of no consequence. *Silverstein v. Commissioner*, 36 T.C. 438 (1961); *Sachs v. Commissioner, supra.*

Petitioners maintain that the principle established in *Wall v. United States, supra,* does not apply where a corporation discharges a joint obligation of the corporation and its shareholders. Relying on *Tucker v. Commissioner*, 226 F.2d 177 (8th Cir. 1955), revg. 23 T.C. 115 (1954), and *Ruben v. Commissioner,*

97 F.2d 926 (8th Cir. 1938), revg. 36 B.T.A. 604 (1937), petitioners conclude that they have not received a constructive dividend because the corporation's payments on the notes, which the corporation signed as comaker, partially extinguished its own liability and only incidentally benefited the shareholders (i.e., petitioners). We disagree.

To be sure, petitioners would have received a taxable dividend had the corporation made an actual distribution to them from its earnings and profits and petitioners had then used the distributed funds to make the payments to Laing under the stock purchase agreement. Sec. 316(a); sec. 301. Moreover, had the corporation not been primarily liable on the notes, but had paid the amounts in question directly to Laing, it is clear that these payments would be taxable to petitioners as dividends. *Wall v. United States, supra; Deutsch v. Commissioner*, 38 T.C. 118 (1962); *Zipp v. Commissioner*, 28 T.C. 314 (1957), affd. per curiam 259 F.2d 119 (6th Cir. 1958). The payments would be regarded as having been distributed to petitioners and transferred by them to Laing. *Wall v. United States, supra*. Here, by contrast, the only factual distinction from this second pattern is that the corporation was primarily liable[13] on the notes executed as part of petitioners' stock purchase. Although petitioners urge us to attach controlling significance to that fact, we decline to do so. In our view, it is a distinction without any real difference.

While we recognize that the corporation was discharging its own obligation on the notes when it paid these amounts to Laing, petitioners have not offered us, nor have we been able to discern any valid business purpose for the corporation incurring such primary liability. Cf. *Gilbert v. Commissioner*, 74 T.C. 60 (1980). Certainly, it was most advantageous to Laing because the corporation's comaker status was a valuable security measure ensuring prompt payment of the unpaid purchase price. By the same token, since the corporation was liable on the notes, petitioners obtained the potential benefit, which was eventually realized, of having the corporation pay for the stock they had purchased. Cf. *United States v. Smith*, 418 F.2d 589 (5th Cir. 1969).

---

[13]Under the law of the State of New Jersey, joint makers of a promissory note are primarily jointly and severally liable to the payee. See *Garon v. Becker*, 118 N.J.L. 98, 191 A. 546, 547 (1937).

It is clear from the record that no valid consideration was received by the corporation for incurring this liability. The corporation did not acquire Laing's stock, nor is there any evidence to indicate that a redemption was contemplated. The entire import of the agreements of July 22, 1966, was that petitioners, alone, were purchasing Laing's stock with the corporation simply obligating itself to pay most of the purchase price. Petitioners did not purchase the stock as mere agents of the corporation, but in their own behalf. Compare *Ciaio v. Commissioner*, 47 T.C. 447 (1967). If a redemption had, in fact, been intended, not only would the agreements have said so, but also the actions of the corporation would have been consistent with that route. Since this is not the case, we refuse to cast the transaction as other than a stock purchase by petitioners. Accordingly, we find that the corporation incurred this liability solely for a noncorporate motive, and, therefore, conclude that no proper corporate purpose was served by subsequent payments extinguishing the debt. Consequently, we believe the rationale of the *Wall* decision compels a decision for respondent on this issue.

The cases relied on by petitioners are clearly distinguishable. In *Tucker v. Commissioner, supra,* a Ford automobile franchise holder sought to comply with the manufacturer's policy requiring the franchise holder to own a controlling interest in the dealership corporation. A minority shareholder agreed to sell the franchise holder sufficient stock to give the latter a controlling interest for a specified price plus 20 percent of the profits for 5 years. The franchise holder paid the named purchase price and had the corporation execute the contract to give the minority shareholder 20 percent of the profits for 5 years. The Eighth Circuit held that the yearly corporate payments were not taxable as constructive dividends to the franchise holder on the ground that the corporate obligation to the seller was supported by valuable consideration and was for a proper corporate purpose in that it preserved a valuable franchise for the corporation. Here, no such consideration or proper corporate purpose can be found.

In *Ruben v. Commissioner, supra,* a court decree had been entered against taxpayer, two other individuals, a common law trust, and a corporation, in which the taxpayer held a 25-percent stock interest, directing that approximately $350,000 be paid by

those defendants to a court-appointed trustee for the benefit of plaintiffs. While an appeal from this decree was pending, a compromise settlement was reached whereby the corporation paid $251,000 in full settlement of all claims against it and its codefendants in the decree. The Court of Appeals for the Eighth Circuit, in reversing our decision, held that the foregoing payment did not result in a constructive dividend to the taxpayer because the corporation compromised the liability in its own interest and gained affirmative advantages through the settlement. Moreover, the court stated that the taxpayer was not enriched in the sense of receiving or accruing any income, but was merely released from a contested money claim by the plaintiffs. In the instant case, unlike *Ruben*, the corporation gratuitously bore a liability for the sole benefit of its shareholders. Thus, the payments in discharge of that liability were not made for an independent and valid corporate business purpose. See *Commissioner v. Makransky*, 321 F.2d 598, 602 (3d Cir. 1963), affg. 36 T.C. 446 (1961); cf. *Cox v. Commissioner*, 56 T.C. 1270, 1280 (1971).

Nevertheless, petitioners argue that they received no economic benefit from these corporate payments because the transaction could have been structured as a redemption with no tax consequences to them. See sec. 302. This argument surely misses the point. Taxation is more dependent upon what was actually done rather than what might have been done. *Television Industries, Inc. v. Commissioner*, 32 T.C. 1297, 1302 (1959), affd. 284 F.2d 322 (2d Cir. 1960). As the court stated in *Woodruff v. Commissioner*, 131 F.2d 429, 430 (5th Cir. 1942): "If a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed." Furthermore, it is irrelevant that these payments did not confer an economic benefit on petitioners in the sense of increasing their net worth. See *Sachs v. Commissioner, supra*. Petitioners still received a substantial benefit in being relieved of their personal obligation to pay for the stock. See *Sullivan v. United States*, 363 F.2d 724, 728–729 (8th Cir. 1966), cert. denied 387 U.S. 905 (1967). Through their total control over the corporation, petitioners were able to use corporate funds to satisfy their debts. Accordingly, we hold that the corporate payments to Laing in partial satisfaction of

the notes constituted constructive dividends to Rawson and each individual member of the Yelencsics group in 1967, 1968, and 1969 in the amounts of \$12,249.37, \$378.87, and \$3,433.72, respectively.[14]

## Issue 3. Negligence Penalty

Respondent imposed the section 6653(a) addition to tax against Rawson for his understatement of income. He argues that Rawson was negligent in failing to keep adequate records or seek tax advice concerning the proper treatment of corporate payments on the notes. Petitioner has the burden of proving that respondent's imposition of this addition to tax was wrong. *Enoch v. Commissioner*, 57 T.C. 781, 802 (1972).

On the basis of the record, we are satisfied that Rawson's underpayment was not due to negligence or intentional disregard of rules and regulations, but solely to a good-faith misunderstanding of the law. *Wofford v. Commissioner*, 5 T.C. 1152, 1166–1167 (1945). The issue as to whether the payments were constructive dividends to him is a relatively complex legal issue on which there can be an honest difference of opinion. Cf. *Marcello v. Commissioner*, 43 T.C. 168, 182 (1964), affd. and remanded in part 380 F.2d 499 (5th Cir. 1967). Rawson was a credible witness and it is our opinion that his position with respect to these payments was not untenable. Moreover, since there is no affirmative obligation to consult with tax experts prior to engaging in a transaction, Rawson's failure to do so will not subject him to an addition to tax. Accordingly, we hold that respondent should not have imposed the section 6653(a) addition to tax.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[14]Since we have held that the corporation is entitled to deduct the \$20,000 yearly payments to Laing under the consulting agreement, the earnings and profits of the corporation are reduced by those amounts. See sec. 1.312–6(a), Income Tax Regs. Accordingly, the recomputed earnings and profits for 1967, 1968, and 1969 were \$48,997.59, \$1,515.47, and \$22,396.76.