WALTER A. MONTPETIT AND FLORENCE E. MONTPETIT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respendent
Montpetit v. Commissioner
Docket No. 22563-80.
United States Tax Court
T.C. Memo 1982-715; 1982 Tax Ct. Memo LEXIS 32; 45 T.C.M. (CCH) 304; T.C.M. (RIA) 82715; December 9, 1982. *32 Held: Petitioner received a constructive dividend in 1970 when a corporation in which he was a shareholder paid for stock transferred by a retiring shareholder to petitioner's wife, as nominee for petitioner. Held further: Fire insurance proceeds which were payable to the corporation but were used by petitioners to purchase a savings certificate were not a constructive dividend. Held further: A partnership in which petitioner was a 50 percent partner was entitled to deduct the entire amount claimed as compensation paid to petitioner's sister-in-law. Held further: Petitioners are not liable for the sec. 6653(a) addition to the tax for their understatement of income in 1970 because they reasonably relied on the advice of their accountant, who had been furnished with necessary information, but they are liable for sec. 6653(a) additions to the tax for 1973 and 1974. Jay B. Kelly, for the petitioners. Stuart D. Gibson, for the *34 respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Sec. 6653 (a) [1]
Year
Deficiency
Addition
1970
$17,779.79
$888.99
1973
3,386.69
169.33
1974
9,893.44
494.67
After concessions by petitioners, only the following issues remain: (1) Is the year 1970 barred by the statute of limitations? (2) Was the transfer by Warren Montpetit (petitioner Walter A. Montpetit's brother) of a half interest in Clayton Club, Inc. (CCI), in return for a $34,983.79 payment by CCI, a stock redemption or a sale of stock to petitioners; and if the latter, was the $34,983.79 a constructive dividend to petitioners? (3) Was Mont-O-Matic, a partnership in which petitioner Walter A. Montpetit held a 50 percent interest, entitled to deduct the entire $8,518.96 it claimed as compensation paid in 1970 to Bettie Jean Montpetit, petitioner Walter A. Montpetit's sister-in-law? (4) Did petitioners receive in 1974 a constructive dividend *35 from Clayton Club, Inc., when they used $10,000 of the corporation's fire insurance proceeds to purchase a savings certificate in their own names?
(5) Are petitioners liable for section 6653(a) additions to the tax for 1970, 1973 and 1974? Because the questions presented here are primarily factual, we have combined the Findings of Fact and Opinion. Some of the facts have been stipulated and are so found. The parties have stipulated that when the petition in this case was filed, Walter A. Montpetit (hereinafter petitioner) and Florence E. Montpetit, husband and wife, resided in St. Paul, Minnesota. Statute of Limitations
The notice of deficiency was mailed to petitioners on September 16, 1980. It has been stipulated that the petitioners timely filed their income tax returns for the years 1970, 1973 and 1974. When these returns were being audited, petitioners executed consents to extend the statute of limitations under section 6501(c)(4). Because of these consents, there is no statute of limitations problem with respect to 1973 and 1974. However, the consent for 1970 was not executed within three years of the date of filing the 1970 return and the statute of limitations *36 will therefore bar assessment of a deficiency for 1970 unless respondent can prove that one of the exceptions set forth in section 6501 applies. Respondent contends that the six-year statute of limitations of section 6501(e)(1)(A) applies here. [2] He has computed the gross income reported by petitioners on their 1970 return for purposes of section 6501(e) as totaling $52,352.09, which petitioners do not contest. Therefore, the six-year statute of limitations applies only if the evidence shows petitioners omitted gross income of more than $13,088.02 from their 1970 return. *37 Most of the income determined by respondent to have been omitted in 1970 was due to his finding that CCI's payment with respect to stock transferred by Warren Montpetit constituted a constructive dividend in that year. Petitioners agree that if respondent prevails on this stock transfer question, the year 1970 will not be barred by the statute of limitations.Because respondent has the burden of proof on the statute of limitations question, [3] the burden is on him to prove that the stock transfer resulted in a constructive dividend to petitioners in 1970. Stock Purchase or Redemption
CCI was incorporated on February 15, 1963. None of its 250 authorized shares of common stock were issued until January 10, 1964, at which time stock certificate number 1 for 10 shares was issued to Clayton Montpetit, certificate number 2 for 115 shares was also issued to Clayton Montpetit, and certificate number 3 for 125 shares was issued to Warren Montpetit. Clayton Montpetit held his 125 CCI chares as a nominee for petitioner, because CCI's liquor license contained a condition that petitioner not be *38 employed or engaged in any manner in the operation of CCI. CCI operated a tavern under the name of Belmont Club from its incorporation through the years in issue. During 1969 a disagreement arose between petitioner and his brother, Warren, concerning the management of the business, particularly with respect to the employment of Warren's son. Because the two brothers believed that one of them should get out of the business, petitioner and CCI's accountant met with the president of the Summit National Bank (SNB) in late 1969 to discuss the corporation's possible buying of the stock of Warren Montpetit. The accountant told both petitioner and the bank that the corporation itself should purchase the stock. Although it is clear that the accountant told petitioner to structure the transaction as a corporate stock redemption, it is not at all clear his advice was followed. The accountant was not himself involved in the actual transfer of the stock. Instead, the stock transfer was handled by an attorney, Richard Copeland, who apparently had no knowledge of the recommendation that the stock be transferred to the corporation rather than petitioner. It has been stipulated that on *39 or about July 1, 1970, CCI secured a $59,000 loan from SNB and that one of the purposes of the loan was to obtain funds to use in paying Warren Montpetit for the transfer of his CCI stock. Among the items of collateral provided SNB was the corporate stock record book, which included the stock certificate issued in the transfer involved here. Included in the loan proceeds were disbursements of $28,000 and $5,683.79, which SNB paid to Warren Montpetit. CCI also gave him its check for $1,300. Thus, the total payment to Warren Montpetit for his CCI stock was $34,983.79. Petitioner claims CCI redeemed Warren's 125 shares. However, the stock transfer record and other documents record Warren Montpetit's 125 shares of CCI stock as having been transferred to petitioner's wife, Florence.Respondent sees petitioner's wife as his nominee and characterizes the stock transfer as a sale rather than a redemption. The evidence concerning the stock transfer is somewhat sketchy, but what evidence we have supports respondent's characterization. The stock transfer record shows that certificate number 3 for 125 shares was surrendered and certificate number 4 for 125 shares was issued to Florence *40 Montpetit. This record was signed by Warren Montpetit and dated July 7, 1970. Although Mr. Copeland could not remember the specific transfer involved here, he testified that the handwriting on the stock transfer record appeared to be his, and that it was his normal practice at that time to fill in the stock transfer record before having it signed. There is no contrary evidence to suggest that the certificate might have been signed in blank by Warren Montpetit. [4] Furthermore, certificate number 3 was marked "Cancelled," and the following was inscribed on it: "For Value Received, I heareby sell, assign and transfer unto Florence E. Montpetit One Hundred Twenty Five Shares represented by the written Certificate * * *." This assignment record bore the date of July 6, 1970, and the signatures of Warren Montpetit and Richard Copeland as witness. Stock certificate number 4, dated July 7, 1970, also shows Florence Montpetit as receiving 125 shares, although there is no evidence showing whether the certificate was ever physically delivered to her or to petitioner. Another factor indicating a stock sale is that the minutes of the 1970 CCI annual shareholders' meeting, apparently prepared *41 by Mr. Copeland but not signed by any corporate officer, stated: The following shareholders were present: Clayton Montpetit and Florence E. Montpetit, each having one hundred twenty five shares of stock and being the sole shareholders of the corporation. It was resolved that the transfer of one hundred twenty five shares from Warren Montpetit to Florence E. Montpetit and the cancellation of Certificate of Stock No. 3 and the issuance of Certificate of Stock No. 4 to Florence E. Montpetit be approved and ratified in all respects. Certain documents prepared after the transfer dates affirm that the transaction was a sale of stock, not a redemption. A letter dated July 13, 1970, from Mr. Copeland to the Mayor and Council of St. Paul stated as follows: This letter is to advise you that on July 6, 1970, Warren Montpetit sold and transferred to Florence E. Montpetit one hundred twenty five (125) shares of Clayton Club, Inc. Since the issuance of this stock to Florence E. Montpetit, all of the stock of Clayton Club, Inc. is owned by Clayton Montpetit and Florence E. Montpetit in equal amounts. Also, *42 a letter to a St. Paul liquor license inspector, which was signed by Warren Montpetit and dated July 16, 1970, stated that his 125 shares in Clayton Club were transferred to Florence Montpetit. Another significant item of evidence is an affidavit, dated July 18, 1970, submitted in relation to a liquor license application. This affidavit was signed by Florence Montpetit and stated that she was not the sole owner of CCI but that Clayton Montpetit owned a half interest in it. Petitioners argue that all this documentary evidence does not conclusively establish that the transaction was other than a stock redemption; they believe controlling weight should be placed upon the intent to effect a redemption that was expressed by the accountant when he and petitioner met with the bank president. They try to downplay the importance of the fact that stock certificate number 4 shows 125 shares as being issued to Florence Montpetit by suggesting that the certificate was never actually delivered to Florence Montpetit, although the record is not clear on this point. Petitioners argue that under Minnesota law title to the stock does not pass when there is a failure to deliver the new certificate *43 to the transferee. But we have held on other occasions that stock certificates are merely documentary evidence of corporate ownership and that for Federal tax purposes their issuance and delivery to a purchaser is not a prerequisite to ownership of the shares represented by such certificates. Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980); Morgan v. Commissioner,46 T.C. 878, 890 (1966). [5] Moreover, the parties asgree that an actual transfer of stock took place here.There is no doubt that Warren Montpetit relinquished all his shares; the only question for us to resolve is whether the transferee of the stock was Florence Montpetit rather than the corporation. Lack of delivery should not be crucial on this point. Petitioners argue at length that Mr. Copeland, the attorney who drew up the transfer documents, did not understand what was intended and therefore erroneously prepared documents showing Florence Montpetit as the transferee. They say that what really was to *44 have taken place was that the corporation was to have purchased Warren's 125 shares, that these shares were to have been held by SNB as collateral for the loan it made to CCI, and that either 115 or all 125 of the shares Clayton Montpetit held as nominee for petitioner were to have been transferred to Florence Montpetit. However, Florence Montpetit's affidavit stated that Clayton Montpetit held a half interest in CCI after the transfer, which is totally inconsistent with the position that he transferred most or all of his shares to her. In the light of this affidavit and her testimony at other points that she did not know in 1970 how many CCI shares she owned, we cannot believe Florence Montpetit's testimony that she mistakenly signed the affidavit assuming that it listed Clayton Montpetit as holding a "part interest" (not a "hlaf interest") based upon her belief that Clayton Montpetit had retained in his name the 10 shares represented by certificate number 1 and transferred to her the 115 shares represented by certificate number 2. Petitioners argue that the corporate records show the transaction was recorded as a stock redemption.On October 31, 1970--almost four months after *45 the transfer--the accountant made an entry to the corporate books recording the transaction as a redemption. However, as we have discussed before, the accountant did not take part in actually conducting the stock transfer. It is apparent that he made the book entry on the basis of what he assumed had transpired, [6] rather than any first-hand knowledge. The letter to the City licensing authority which we mentioned above, is further evidence that all the individuals involved saw the transaction as a sale of stock, not a redepmtion. Petitioners claim that Warren Montpetit's son, the attorney who prepared the letter to the licensing authority, never understood the transaction since he was employed only for the purpose of notifying the liquor authority. But even if he did not have first-hand knowledge of the transaction, he must *46 have been provided by one of the parties, most probably his father, with an explanation of what took place. Evidently, the transaction was described to him as a stock sale not a redemption. Looking at the facts before us, it is clear that Florence Montpetit was the named transferee of Warren Montpetit's 125 shares of CCI. Apparently, she held these shares as nominee for petitioner, since she testified that she was never an active shareholder and was uncertain as to the number of shares she held and from whom they were received, and petitioner testified that he considered himself to be the corporation. On the basis of all these facts, we conclude that Warren Montpetit sold his CCI stock to petitioner, with CCI paying the purchase price. We now analyze the legal consequences of so characterizing the stock transfer. Respondent sees the corporation's payment of the purchase price of the shares as being a constructive dividened because the transaction was structured as a sale to petitioner, who was the sole shareholder after the sale. We agree with respondent. Zipp v. Commissioner,28 T.C. 314 (1957), affd. per curiam 259 F.2d 119 (6th Cir. 1958), *47 is directly on point. There, as in this case, shares held by a retiring shareholder were sold to the continuing shareholders and paid for by the corporation, which had borrowed funds to pay for the shares. Since the arrangement had the same effect as though the continuing shareholders had withdrawn funds from the corporation for their own use and benefit, the Court found that amounts paid for the retiring shareholder's stock were dividends to the continuing shareholders. We find the same situation here. The corporation paid petitioner a constructive dividend of $34,983.79, which he used to pay for the stock transferred by his brother. [7]
*48 Petitioner argues that this cannot be the correct result because he does not see himself as having received any economic benefit from the transaction. This argument misses the mark because factually we have found that the 125 shares held by Warren Montpetit were transferred to Florence Montpetit, as nominee for petitioner. Petitioner was obligated to pay the $34,983.79 purchase price of the shares. In discharging this obligation, the corporation gave him a substantial economic benefit, sufficient to constitute a constructive dividend. See Sullivan v. United States,363 F.2d 724, 729 (8th Cir. 1966); Yelencsics v. Commissioner,supra at 1532. That petitioner could readily have structured the transaction as a redemption of the stock by CCI, as had been suggested by his accountant, and that the tax consequences of so proceeding would have been markedly different, is irrelevant in determining the legal consequences of what was actually done. As the court stated in Woodruff v. Commissioner,131 F.2d 429, 430 (5th Cir. 1942): [I]f a taxpayer has two legal methods by which he may attain a desired result, the method pursued *49 is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed. [Footnote omitted.] Petitioners next contend that even if we find that the corporation's payment for the shares was a constructive dividend, it should be reported in income in 1971 rather than 1970. The effect of requiring the constructive dividend to be reported in 1971 would be to relieve petitioners from having to pay any tax relating to this constructive dividend since the year 1971 is not at issue here and the year 1970 will be barred by the statute of limitations if the constructive dividend income does not apply to that year. Petitioners point out that under sections 301 and 316(a)(2) a dividend is a distribution made by a corporation out of its earnings and profits computed as of the close of its taxable year. The taxable year for CCI did not end until January 31, 1971, and petitioners reason that the constructive dividend should be seen as occurring as of that date.
Section 1.301-1(b), Income Tax Regs. *50 , provides generally that a distribution made by a corporation to its shareholders shall be included in their gross income when paid or otherwise unqualifiedly made subject to the shareholders' demands. Here, the distribution was made when the corporation paid the $34,983.79 to Warren Montpetit--in July of 1970. This must be used as the date of distribution for purposes of section 301. Petitioner is correct in saying that he could not determine until the close of the corporation's taxable year on January 31, 1971, whether the distributions were from current earnings and profits and thus dividends under section 316(a)(2). [8] But the fact that it is impossible until after close of the taxpayer's taxable year to determine if the distribution should be treated under section 316(a)(2) as a dividend does not change the date on which the distribution was made--in this case, July 1970. Under section 301(c), the distribution is treated as a dividend if it meets the requirements of section 316. Section 316(a)[9] *51 requires a distribution to be treated as a dividend if made out of accumulated earnings and profits or earnings and profits of the taxable year. Distributions are to be viewed as made out of the most recently accumulated earnings and profits. Thus, a corporation's earnings and profits for the taxable year of distribution are first examined to see if they are sufficient to cause the distribution to be a dividend. Only if these current earnings and profits are insufficient is it normally necessary to see if the corporation has accumulated earnings and profits at least equal to the amount of the dividend. *52 We do not have evidence in the record to determine if CCI had earnings and profits for its taxable year ending January 31, 1971, sufficient to make the amount paid for Warren Montpetit's stock a dividend to petitioner. But the corporation did report on its income tax returns accumulated earned surplus of $47,579.42 as of January 31, 1970, and $47,818.80 as of January 31, 1971. Although earned surplus is not identical to earnings and profits, there is a clear retationship between these two amounts, and petitioner has not objected to respondent's requested finding of fact that CCI had accumulated earnings and profits as of July 7, 1970, in excess of $35,000. To us, this indicates petitioner is conceding that if we find, as we have, that the payments to Warren Montpetit were a distribution by CCI to petitioner in 1970, then the distribution should be seen as derived from the corporation's earnings and profits. Therefore, we find that the entire $34,983.79 was a dividend to petitioner in 1970, and that the statute of limitations has not run for that year. Payments to Bettie Jean Montpetit
During 1970 petitioner and Earl Montpetit, his brother, were each 50 percent partners *53 in Mont-O-Matic, a business that leased and serviced electric liquor dispensers. During the mid 1960's the operation of this business had been carried on primarily by Clayton Montpetit, another brother of petitioner. After 1968, when Clayton Montpetit had a heart attack and open heart surgery, his wife, Bettie Jean Montpetit, took over primary responsibility for conducting the business on a day-to-day basis, although he continued to help when able. The primary business location was Clayton and Bettie Jean Montpetit's home, which was used for storing some equipment and as a place for conducting the business by telephone. Bettie Jean Montpetit, and sometimes her husband, received and relayed telephone calls for Mont-O-Matic. If neither of them were available to take a telephone call, their children sometimes took messages from the callers. Bettie Jean Montpetit testified that Mont-O-Matic had between 50 and 60 customers and that most complaints or problems of customers could be handled over the telephone. Sometimes, if a machine was broken she could simply call the place of business to correct the trouble. Occasionally, she would send either her nephew or a friend out to take care *54 of a particular problem. Additionally, she was responsible for receiving checks from the lessees and for posting the checks and bills in the accounts payable and accounts receivable. She did not herself reconcile the books but a bookkeeper was retained for this purpose. The compensation arrangement for Bettie Jean Montpetit was quite unique in that she was not paid a set wage or salary. Instead, the partnership paid cartain of her and her husband's household expenses, such as mortgage payments, and treated these amounts as wages paid to her. For 1970 Mont-O-Matic deducted $8,518.96 as wages paid to Bettie Jean Montpetit. Upon audit, respondent determined that only $600 of this amount constituted reasonable compensation for personal services actually rendered by Bettie Jean Montpetit. Not only did the compensation take the form of payments for household expenses rather than salary or wages, but Bettie Jean Montpetit kept no records of the hours she worked and was not even aware of the method the partnership used to determine the amount paid for her services. She was unable to testify as to the approximate amount of time per week that she worked or the number of telephone *55 calls she handled per day, although she did state that she would receive calls at any time of the day, seven days a week. Her lack of precise memory is somewhat understandable given the fact that the events in question here occurred almost 12 years prior to the date of trial. But, unfortunately, this leaves us with a very imprecise record upon which to make a conclusion. We note, though, that respondent has introduced no evidence to explain why the partnership would have paid Mrs. Montpetit amounts far in excess of the value of the services rendered by her. Neither she nor her husband was a partner in Mont-O-Matic, so the amounts paid to her could not possibly have been meant as a share of partnership profits. Bearing in mind that petitioners have the burden of proof on the issue, we find, nevertheless, that the entire amount claimed by the partnership as compensation to Bettie Jean Montpetit was properly deducted by it. Certainly, Bettie Jean Montpetit did perform important services for the partnership. Indeed, it is clear that the partnership's principal place of business was her home, being used not only for equipment storage but as a place to which all telephone calls could *56 be referred. The fact that the payments to her were made by paying household expenses rather than by giving her a check for wages or salary should not be determinative as to the nature of the payments. The crucial consideration is whether they were reasonable and purely for services rendered, section 1.162-7(a), Income Tax Regs., and we find here that the payments met this test. The fact that Bettie Jean Montpetit did not personally perform all of the tasks for which she was compensated does not establish that the amounts paid to her were unreasonable compensation. It is clear that Mont-O-Matic looked to her for performance of the services. That her children occasionally took telephone messages for her did not detract from the fact that she was the actual earner of the income, and she should therefore be seen as the person who received it. See Fritschel v. Commissioner,79 T.C. 152 (1982). Fire Insurance Proceeds
During CCI's fiscal year ended January 31, 1974, two successive fires occurred at the Belmont Club. Part of the insurance proceeds payable to CCI because of the second fire was paid by a check for $10,000, received *57 by the petitioner on April 9, 1974. Rather than depositing the check into the corporate bank account, petitioner used the $10,000 check to purchase a 48-month savings certificate in his and his wife's names. The savings certificate was then used as collateral in securing a $10,000 loan in the name of petitioner doing business as Flomont, Inc., which was to be repaid to the bank in installments over three years. The loan proceeds were deposited to CCI's bank account. Initially, CCI's accountant was unaware that petitioner had received the $10,000, and on CCI's books he recorded the loan taken out in the name of Flomont as a credit to insurance proceeds receivable. However, after the accountant learned of the precise nature of the transaction, on December 31, 1974, he made an adjusting journal entry on CCI's books showing the $10,000 as a loan or charge to shareholder's account After the revenue agent audited CCI and asked petitioners for records concerning the fire insurance proceeds, petitioners cashed the savings certificate and deposited the $10,584.91, representing the face amount of the certificate plus interest, in CCI's bank account during the week of July 7, 1975. At *58 this time, CCI was experiencing a "cash crunch," and amounts derived from the savings certificate may have been used to meet this problem. Respondent has characterized the $10,000 used by petitioners to purchase a savings certificate in their names as a constructive dividend, while petitioners see the amount as a loan.Respondent stresses that Walter A. Montpetit never executed a note to the corporation or agreed to pay the corporation any interest on the $10,000. But the existence of a note is only one of the factors to consider in determining whether there was a loan or a dividend. Wiese v. Commissioner,35 B.T.A. 701, 704 (1937), affd. 93 F.2d 921 (8th Cir. 1938). The absence of a note here is consistent with the informal and sometimes sloppy record keeping of petitioner and his wholly owned corporation. Moreover, the December 31, 1974, journal entry shows clearly that petitioner's keeping the insurance proceeds was recognized as a loan from the corporation. Even more important is the fact that the savings certificate was used as collateral for obtaining *59 a $10,000 bank loan, the proceeds of which were deposited to CCI's account. On the record it is not clear why petitioner took the course of action that he did, but it is apparent that CCI had immediate use of funds equal in amount to the $10,000 check retained by petitioner. The $10,000 bank loan was to be repaid in installments, which were being paid by CCI rather than petitioner. No schedule was set up for petitioner to repay the $10,000 he used to purchase the savings certificate, although it is reasonable to accept his testimony that the entire amount was to be repaid when the certificate matured. Respondent had presented no evidence that petitioners did not intend to repay the corporation. Indeed, when the corporation had a cash crunch in July of 1975, they cashed the certificate and paid it over to CCI. Although the repayment was done after the revenue agent raised questions concerning the treatment of the fire insurance proceeds, we cannot accept respondent's allegation that the repayment was merely an attempt to undo a previous diversion of corporate receipts.Rather, based on the facts presented, we conclude that the $10,000 used by petitioners to purchase the savings *60 deposit was not a constructive dividend and was not income to them in 1974. Section 6653(a) Additions to the Tax
Respondent determined that petitioners were liable for section 6653(a) additions to the tax for all the years at issue--1970, 1973 and 1974. Except for the adjustments discussed in the prior portions of this opinion, petitioner conceded the deficiencies determined by respondent. However, for all the years in issue they still contest the section 6653(a) additions, arguing that any underpayments were not due to their negligence or intentional disregard of rules or regulations. We believe the year 1970 should be analyzed separately from the years 1973 and 1974 in determining whether the section 6653(a) addition should be applied. In the prior year, almost the entire deficiency resulted from respondent's finding CCI's payment for the shares transferred by Warren Montpetit to be a constructive dividend to petitioner. [10]
*61 Respondent's determination that petitioner's failure to report income was due to negligence is prima facie correct and casts the burden upon petitioner to prove the imposition of the addition to the tax was erroneous. Pritchett v. Commissioner,63 T.C. 149, 174 (1974); Enoch v. Commissioner,57 T.C. 781, 802 (1972). The duty to file accurate returns cannot be avoided by simply placing responsibility on an agent, but when the taxpayer furnishes the agent with necessary information concerning the contested transactions and reviewed the return, his good faith reliance on the agent may in appropriate circumstances protect him from the negligence addition. Pritchett v. Commissioner,supra;Enoch v. Commissioner,supra.This is particularly true when income is understated because of expert advice as to includability or deductibility. [11]
We have found that the stock transfer in 1970 was not a redemption as assumed by petitioners' accountant *62 in preparing their return for that year but that it was a sale of stock paid for by CCI. Florence Montpetit's testimony shows that she never realized the extent of stock registered in her name, and it seems that petitioner never seriously focused on the fact that transferring the stock to his wife as his nominee, rather than to the corporation, could result in any different tax consequences. He did not withhold any information from his accountant or intentionally deceive him but simply never understood the nature of the transaction.It is understandable that neither the accountant nor petitioner actually looked at the stock record book and certificates when the return was filed since these records were being held by the bank as collateral and were thus not readily available. We have no reason to believe otherwise than that petitioner had an honest, but mistaken, belief that the stock transfer resulted in no tax liability to him and that he believed he had made all necessary information concerning the stock transfer available to his accountant. In these circumstances and in view of the confusion surrounding the stock transfer itself, we believe petitioners' reliance on their accountant *63 was reasonable and that respondent should not have imposed the section 6653(a) addition to the tax for 1970. Cf., Yelencsics v. Commissioner, supra at 1533. The years 1973 and 1974 are a different matter, however. Aside from the deficiency determined by respondent with respect to petitioners' use of the $10,000 fire insurance proceeds, which we have discussed earlier in this opinion, the primary items on which the section 6653(a) additions were based were payments made to third parties by CCI for the benefit of petitioners ($6,848.93 in 1973; and $11,472.82 in 1974); $4,450 of unreported gambling winnings in 1973; adjustments to Mont-O-Matic's income ($4,377 for 1973; and $2,327 for 1974); and disallowance of depreciation deductions because respondent determined the building being depreciated was not owned by petitioners. Petitioners have conceded all these adjustments but stress that they were mostly normal audit-type adjustments attributable to accounting misjudgments or misclassifications. However, petitioners have presented no specific evidence on this point. From the record, we have been left largely in the dark concerning the precise nature of the thirdparty *64 payments and the adjustments to Mont-O-Matic's income. Moreover, if there were misclassifications and misjudgments, they may well have been due in part to the fact that CCI and Mont-O-Motic's records were inadequate with respect to particular transactions. The revenue agent's uncontradicted testimony was that CCI failed to maintain cash register receipts, and Mont-O-Matic apparently made a practice of disposing of all bills when they were paid. Because petitioners have not pinpointed the nature of most of the items leading to the deficiencies in 1973 and 1974, we can but guess at the overall effect of these record keeping problems. Petitioners have presented us with no evidence that they furnished their accountant, who prepared their returns, sufficient evidence to enable him to correctly classify payments made by CCI or Mont-O-Matic, and therefore their reliance on their accountant cannot help them escape the section 6653(a) addition. See Daugherty v. Commissioner,78 T.C. 623 (1982). Accordingly, we hold that petitioners are liable for section 6653(a) additions to the tax for the years 1973 and 1974. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. Sec. 6501(e)(1)(A) provides: (A) General Rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.↩
3. See Farmers Feed Co. v. Commissioner,10 B.T.A. 1069↩ (1928).
4. Compare Mozert v. Commissioner,T.C. Memo. 1979-263↩.
5. See also O'Reilly v. Commissioner,T.C. Memo. 1968-291↩.
6. The accountant's vague recollection that sometime after making this entry he asked Walter Montpetit and Warren Montpetit whether the corporation was the transferee and that they replied affirmatively does not indicate to us that the parties saw the transaction as a redemption. Act best, it indicates their inattention to the details of the transfer.↩
7. Cases such as Wall v. United States,164 F.2d 462 (4th Cir. 1947); Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980); and Mozert v. Commissioner,supra,↩ recognize that a corporation's discharge of a continuing shareholder's personal obligation to pay for stock of a retiring shareholder constitutes a constructive dividend to the continuing shareholder. Although these cases are not directly on point since they involved obligations that the continuing shareholders had definitely incurred prior to the date of payment, in contrast to this case in which petitioner had no preexisting obligation to purchase his brother's stock, we believe they provide support by analogy for our conclusion herein.
8. See Bittker, Federal Taxation of Income, Estates and Gifts, par. 92.1.2.↩
9. Sec. 316(a) provides: (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
10. The constructive dividend attributable to this stock transfer was $35,000. An additional $2,400 constructive dividend was based upon respondent's finding that petitioner had personal use of a corporate automobile. Petitioners have conceded this automobile issue. The third adjustment to petitioners' 1970 income was due to deductions disallowed to Mont-O-Matic by respondent, primarily the deduction with respect to the compensation to Bettie Jean Montpetit. We have found against respondent on this latter issue so there can be no finding of negligence in this respect.↩
11. See Plese v. Commissioner,T.C. Memo. 1978-326↩.