WENDELL B. MOZERT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mozert v. Commissioner
Docket No. 8151-77.
United States Tax Court
T.C. Memo 1979-263; 1979 Tax Ct. Memo LEXIS 261; 38 T.C.M. (CCH) 1037; T.C.M. (RIA) 79263; July 16, 1979, Filed Theodore W. Glocker, Jr., for the petitioner. Roger D. Osburn, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax for *262 the calendar years 1973 and 1974 in the amounts of $18,355.60 and $1,519.31, respectively, and an addition to tax under section 6651(a)(1), I.R.C. 1954, [1] for the calendar year 1973 in the amount of $4,588.90. The issue for decision is whether petitioner realized a dividend in the amount of $60,000 because of payment by a corporation of his obligation to purchase all of his father's stock in the corporation or did the corporation in fact purchase the stock from petitioner's father. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in Gainesville, Florida at the time of the filing of his petition in this case, filed joint Federal income tax returns with his wife, Martha J. Mozert, for the calendar years 1973 and 1974 with the Director of the Internal Revenue Service Center, *263 Chamblee, Georgia. University City Photo Supply, Inc. (University) is a Florida corporation organized in 1964 by R. Bruce Mozert (Mr. Mozert), petitioner's father. On April 29, 1964, University issued 300 shares of capital stock represented by four stock certificates. Certificate No. 1 for one share was issued to petitioner. Certificate No. 2 for one share was issued to petitioner's mother, Elizabeth D. Mozert. Certificate No. 3 for three shares and Certificate No. 4 for 295 shares were issued to petitioner's father. Petitioner's mother died in 1972 and Mr. Mozert, her husband, inherited her one share of stock in University, so that at the beginning of 1973 he owned 299 out of 300 shares of University stock. University operated two photographic equipment supply stores in Gainesville, Florida and one such store in Tallahassee, Florida. Immediately following its formation in 1964, University was managed by a person unrelated to petitioner or his father. Thereafter, petitioner became the manager of University. Prior to 1973, petitioner and his father began having disagreements as to the method of operation of the photographic equipment stores. Because of this fact, petitioner *264 asked his father if he would sell his stock, and if so, to name a price. After being asked by petitioner about selling his stock, petitioner's father offered to sell his 299 shares of stock represented by Certificate Nos. 2, 3 and 4 for the sum of $60,000. On October 26, 1973, petitioner's father wrote two letters addressed to his son, petitioner, at the University City Photo Supply address in Gainesville, Florida. One of these letters reads as follows: I am enclosing the letter you requested for the bank. This letter is for the agreement between you and me. If you sell the Corporation or any part of this corporation to any other person within five (5) years of our closing date, I want 1/2 of the current assets of the total corporation, as they stand on our closing date less sixty thousand ($60,000.00). My agreement to sell the corporation to you is good for thirty (30) days from the date of both letters. The body of the second letter is as follows: After some deliberation I have decided to sell all of my shares in the three stores of the University City Photo Supply Inc. for the sum of sixty thousand dollars ($60,000.00) to you. You will then be 100% owner of said *265 corporation. All I ask is that any photographic materials or equipment from said Corporation I may purchase at cost, as you know the Corporation is growing to almost a half-million mark. Hoping that this can be worked out satisfactory to both parties. Petitioner personally did not have sufficient money to purchase his father's stock for $60,000 and his earnings were not sufficient that he believed he would be able to get a personal loan for the amount necessary to purchase his father's stock. University, however, had sufficient financial stability to borrow the amount necessary to purchase petitioner's father's stock. Petitioner first approached the First National Bank of Gainesville with respect to arranging a loan for the purchase of the stock. Petitioner had received no answer from officials of the First National Bank of Gainesville with respect to whether such a loan would be granted when he discussed the need for such a loan with Mr. Herbert Schwartz, a longtime friend of petitioner's and his attorney. Petitioner told Mr. Schwartz that because he and his father were not in agreement with respect to how the stores run by University should be operated his father was willing *266 to sell his stock in University. Petitioner told Mr. Schwartz that he had been trying to arrange a loan for purchase of the stock through the First National Bank of Gainesville but that the bank was dragging its feet on approving the loan. Mr. Schwartz suggested to petitioner that he see Mr. John Jennings, president of the Citizens Bank of Gainesville, later known as Sun Bank of Gainesville (Sun Bank). Mr. Schwartz arranged for petitioner to meet with Mr. Jennings of Sun Bank. Petitioner and Mr. Schwartz had arranaged to have lunch together on the day Mr. Schwartz had set up the meeting with Mr. Jennings. Petitioner went by Mr. Schwartz' office and he and Mr. Schwartz walked over to Mr. Jennings' office at Sun Bank. On the way over, petitioner discussed with Mr. Schwartz how the stock to be received for the loan which was to be negotiated should be handled, and Mr. Schwartz told him that he thought the corporation should buy the stock. When petitioner and Mr. Schwartz arrived at Sun Bank, Mr. Schwartz introduced petitioner to Mr. Jennings. He told Mr. Jennings that University was a family-owned corporation, the shareholders being petitioner and his father and that the loan *267 which the corporation wanted to negotiate was to be used to buy petitioner's father's stock which he believed should be held as treasury stock. After introducing petitioner and talking for a few moments with Mr. Jennings, Mr. Schwartz left and went out in the lobby of the bank to have a cup of coffee with a friend. Petitioner talked with Mr. Jennings for 15 or 20 minutes about a loan and received tentative approval for a $96,000 loan to the corporation subject to a check by the bank of the financial statements of the corporation which had been furnished to Mr. Jennings by petitioner. Of the $96,000 loan, $36,686.69 was to be used to pay off loans owed by University to the First National Bank of Gainesville, and the balance was to be used to purchase the stock owned by petitioner's father. When petitioner left, he was assured that unless some complication were encountered, the loan would be granted. Following approval of the loan by the bank, Mr. Jennings called Mr. John Steadham, the bank's attorney, and gave him details of the loan and requested him to prepare the proper loan documents. Mr. Steadham had not been present when the loan was arranged. He made some notes with respect *268 to his conversation with Mr. Jennings. One of these notes states: "Mozert will use $60,000.00 of proceeds to purchase all of his father's stock in University City Photo Supply, Inc." Arrangements were made to close the loan on November 19, 1973. As security for the loan to University the bank demanded a security agreement covering the corporation's accounts receivable and inventories, a pledge of the corporate stock as collateral, and petitioner's personal guarantee of the loan. At the closing of the loan on November 19, 1973, University gave the bank a secured note for $96,000. The note was executed by petitioner as president of University and petitioner in his individual capacity endorsed and unconditionally guaranteed the corporate note. The closing agreement on the loan was as follows: BORROWER: UNIVERSITY CITY PHOTO SUPPLY, INC. LENDER: SUN BANK OF GAINSEVILLE SECURITY: Corporate stock, accounts receivable, inventory LOAN PROCEEDS:
$96,000.00
LESS Borrowers Expenses: File U.C.C. Form 1 $ 4.00
File U.C.C. Form 11
4.00
Documentary Stamps on Note
144.00
Attorney's fee-preparation
of Loan Documents
175.00
-327.00
NET LOAN PROCEEDS:
$95,673.00
CHECK FROM BORROWER:
1,044.37
TOTAL TO DISBURSE:
$97,044.37
DISBURSEMENTS BY LENDER: TO: First National Bank of Gainesville
Pay off Two Loans
(1) $31,000.00 Principal
541.37 Interest
(2) 5,000.00 Principal
145.32 Interest
36,686.69
$36,686.69
TO: Watson, Watson & Steadham
Preparation of Documents
175.00
TO: Sun Bank of Gainesville
Documentary Stamps on Note
144.00
TO: Department of State
Record U.C.C. Number 1 and 11
9.00
* TO: University City Photo Supply, Inc.
Balance of Loan Proceeds
0
TO: R. B. Mozert -- Stock purchase; deposit to
account of Mozert Studios, Sun Bank of Ocala,
Account Number 01-849-5
$60,000.00
*269 The closing agreement was signed by University City Photo Supply, Inc. by petitioner. Mr. Steadham, in connection with the loan closing, prepared in handwriting the following check list: CHECK LIST -- U.C. PHOTO SUPPLY, INC. 1. Promissory Note -- Corporate 2. Personal Endorsement of Note 3. Personal Guaranty 4. Security Agreement-- 5. --Accounts Rec. 6.--Inventory 7. --Contract Rights 8. Schedule of Inventory 9. U.C.C. Form 1 10. U.C.C. Form 11 11. Corporate Banking Resolution 12. U.C.C. Form 3 1st Nat. Bank 13. Pay off letter 1st Nat. Bank 14. Pledge Agreement -- Stock 15. Affidavit -- Stock 16. Loan Closing Statement 17. Truth In Lending Disclosure 18. Affirm Corporate Status 19. Landlords Waiver 20. Stock w/Power of Attorney to Bank At the closing on November 19, 1973, petitioner, on behalf of *270 University, as its president, executed a security agreement from University to the bank covering the corporation's inventory and accounts receivable. Also, petitioner, in his individual capacity, executed a security agreement dated November 19, 1973, which states that in consideration for the loan to University he pledges to the bank a security interest in Certificate No. 5, of University, representing 298 shares. After petitioner had been informed of the closing date of the loan, he called his father and asked his father to be present at the closing. At the closing, petiitoner signed several papers, but his father did not sign any papers. The day after the closing, Miss Jan Joyner, Mr. Jennings' secretary, called petitioner and told him that the stock certificates which his father was supposed to have signed at the closing had not been signed and that these certificates would have to be signed before the money could be disbursed. Petitioner then called his father and found that his father was somewhere near Dunnellon, Florida, doing television photography and arranged to meet his father on the side of the road so that his father could sign the certificates and petitioner could *271 return the certificates to the bank.Petitioner took the certificates to his father on the side of the road and he gave his father all four of these certificates, including his own. Petitioner's father signed all four certificates and all four signatures were witnessed by the client who was with his father in connection with the photographing of the television commercials. Petitioner then returned the certificates to the bank. At the time petitioner's father signed the certificates, there was no name in the space provided for the person to whom the certificates were assigned filled in. At the time the revenue agent commenced his investigation of petitioner's tax liability for the year 1973 in early 1976, these certificates were in the corporate minute book which was in the office of petitioner's attorney, Mr. Schwartz. Shortly after the closing of the loan to University on November 19, 1973, Mr. Schwartz sent University's combined minute book-stock book to Mr. Steadham at Mr. Steadham's request. Petitioner obtained the minute book from Mr. Schwartz for the revenue agent and the revenue agent located the stock certificates signed by petitioner's father loose in the minute book. *272 At that time, Certificate No. 3 for three shares of stock and Certificate No. 4 for 295 shares of stock had on the back, above the endorsement under the designation to whom the stock was assigned, petitioner's name in typewriting, as well as the number of shares typed in on the back. The Sun Bank's security ledger sheet No. 1955 states that the bank received from petitioner University Certificate No. 5 for 298 shares of University stock. This sheet also contains a form statement signed by petitioner that the collateral was returned to him on May 12, 1976. The stockholder's ledger sheet in University's combined minute book-stock book contained sheets indicating that on November 19, 1973, petitioner received Certificate Nos. 3 and 4 from R. Bruce Mozert and that new Certificate No. 5 for 298 shares was issued to petitioner on November 20, 1973. The ledger sheet indicates that Certificate No. 5 was issued to petitioner to replace Certificate Nos. 3 and 4. On its balance sheet for its fiscal year ended October 31, 1974, University showed the stock purchased from petitioner's father as treasury stock and likewise on its corporate income tax return for its fiscal year ended October 31, 1974, University *273 treated the stock purchased from petitioner's father as treasury stock. Shortly after the purchase of his father's stock when petitioner became president rather than secretary/treasurer of the corporation, petitioner contacted Mr. D. H. McSwain, a certified public accountant, with respect to the keeping of petitioner's personal books and the corporate books of University. Prior to that time University's books had been kept by accountants in Ocala, Florida, where petitioner's father lived. Mr. McSwain agreed to keep the books, and in connection with going over the records and reconciling loan accounts, Mr. McSwain questioned petitioner with respect to the stock purchased from his father. Petitioner told Mr. McSwain at that time that the stock had been purchased by the corporation and was held as treasury stock and that he wanted to call his attorney, Mr. Schwartz, to confirm this. Petitioner did call Mr. Schwartz, who confirmed the fact to Mr. McSwain that the corporation had purchased the stock of petitioner's father and was holding it as treasury stock. For that reason, the accountant set the stock up on the books as treasury stock in late 1973 and handled it that way on the corporation's *274 balance sheets and the corporation's tax returns. On June 26, 1974, University secured a new loan from the Florida National Bank and used the proceeds in part to pay off the $90,334.23 balance due on its loan to Sun Bank. The records of Sun Bank show that its loan to University was paid in full on June 26, 1974. When the revenue agent asked for the corporate minute book of University and petitioner procured the minute book for him from Mr. Schwartz, the agent found loose in the minute book a paper headed "MINUTES," which reads as follows: A meeting of the Board of Directors of University City Photo Supply, Inc. was held at the corporate offices in Gainesville, Florida on November 15, 1973. The following business transpired: The President was authorized and directed to complete negotiations for and close a loan from the Citizens Bank of Gainesville to purchase, for the corporation, all the shares of stock now owned by R. Bruce Mozert. Such stock to become treasury stock subsequent to it being redeemed by purchase. There being no further business, the meeting was adjourned. These minutes bear the signature of petitioner as president. Petitioner on his Federal income *275 tax return for the calendar year 1973 did not include in his income any amount in connection with the purchase of his father's stock. Respondent in his notice of deficiency increased petitioner's income as reported by $60,000 with the following explanation: During the taxable year 1973, University Photo Supply, Incorporated made certain payments to you or for your benefit. It is determined that such items comprise dividend income under Sections 301, 61, and 316 of the Internal Revenue Code of 1954 and are includable in your gross income * * *. OPINION Both parties recognize that under the provisions of sections 61, 301 and 316, and cases interpreting those sections, if petitioner was individually legally obligated to purchase his father's stock and the corporation paid petitioner's binding obligation, the corporation has made a distribution to petitioner which is essentially equivalent to a dividend. Wall v. United States,164 F.2d 462, 464 (4th Cir. 1947); Woodruff v. Commissioner,131 F.2d 429 (5th Cir. 1942); McGinty v. Commissioner,38 T.C. 882 (1962). However, if the corporation itself purchased the stock when petitioner *276 had no binding legal obligation to purchase it, the purchase by the corporation is not a dividend to petitioner. Priester v. Commissioner,38 T.C. 316, 326-29 (1962). The issue here, therefore, narrows down to the fact question of whether petitioner was legally obligated to personally purchase his father's stock and if so, was that obligation discharged by University. As was pointed out in Ciaio v. Commissioner,47 T.C. 447, 457 (1967), in making this determination, as is true with other determinations in the field of taxation, substance must prevail over form. The fact that the typing on the stock certificates and the stock transfer book showed petitioner's father's shares as assigned to him is not controlling if, as petitioner contends, this was never the intention of petitioner in connection with the purchase, but in fact, the intention throughout was that the corporation purchased the stock.See also Bennett v. Commissioner,58 T.C. 381 (1972). Respondent's argument is based primarily on the fact that the two stock certificates of petitioner's father for a total of 298 shares of University stock when located by the revenue *277 agent in early 1976 showed petitioner to be assignee of the certificates, and that a new Certificate No. 5 also located by the revenue agent at the same time showed that the certificate was issued to petitioner for the 298 shares. Respondent also relies on the fact that the security agreement executed personally by petitioner listed as collateral Certificate No. 5 for 298 shares of University stock. Both petitioner and petitioner's attorney, Mr. Schwartz, testified that they did not know who typed petitioner's name on the certificates after they were signed in blank by petitioner's father. The record is clear that petitioner's father did not sign the certificates until the day after the closing even though the certificates should have been present when the loan was closed. The attorney for the bank, Mr. Steadham, and the bank president, Mr. Jennings, both testified that they would not have inserted petitioner's name without obtaining his authorization or had this insertion made by somebody else without obtaining that authorization. Petitioner's attorney, Mr. Schwartz, testified that he did not place petitioner's name on these certificates and did not believe anyone else in his *278 office would have done this. It is clear that petitioner did not have his name placed on the certificates since he never saw the certificates again after delivering them endorsed in blank to the bank until the revenue agent began to investigate his tax liability for the year 1973 in early 1976. Is is also clear that on November 19, 1973, when petitioner signed the security agreement, no Certificate No. 5 for 298 shares had been issued to petitioner since this certificate was not issued by whoever prepared it until November 20. Petitioner testified that he did not read the agreement before he signed it since he thought it was a mere routine form agreement and therefore did not know whether the typed portion with respect to Certificate No. 5 was in the agreement when he signed it or not. If this typed portion was in the agreement on November 19, 1973, when petitioner signed it, someone at the bank had typed in as security a nonexistent certificate. If it was not in the agreement at the time petitioner signed the agreement, the typing above petitioner's signature would have to have been done by someone at the bank. In any event the bank was not a party to the purchase of the stock *279 and the understanding of the bank officials is not determinative of the intent of petitioner. Ciaio v. Commissioner,supra at 461. Although the name of the assignee on the two certificates is petitioner's and Certificate No. 5 for 298 shares was in petitioner's name, the evidence is clear that the books and records of the corporation from shortly after the date of the transaction showed the corporation as the owner of the stock and that the stock was held as treasury stock. This setup was made by the new accountant petitioner engaged after he became the sole owner of the corporation. The accountant inquired of petitioner about the transaction and petitioner told him he thought the stock was treasury stock and would verify it with his attorney Mr. Schwartz. The attorney verified that the stock was purchased by the corporation and was treasury stock. The setup of the stock as treasury stock was made on the corporate books long before any investigation of petitioner's tax liability was begun. Also, minutes were drafted sometime around the time of the loan transaction authorizing the corporation to purchase the stock and hold it as treasury stock. Although the *280 exact date of the drafting of these minutes is not shown, it is clear that they were drafted and signed by petitioner around the time, or shortly after the closing, of the loan. The minute book had been out of petitioner's custody since that time and these minutes were found in the book by the revenue agent investigating the case after petitioner procured the minute book-stock book for him. Respondent also relies on the letters written by petitioner's father to petitioner, one for petitioner to take to the bank and the other to petitioner personally. In the first place, the use of "you" in a situation of a wholly owned corporation in referring to the corporation is not unusual for laymen. At the trial, petitioner in testifying about negotiation of the loan and needing money for the corporation to pay off a corporate loan at the First National Bank of Gainesville stated: "And I explained that I still owed money to First National Bank * * *." [Underscoring supplied.] Obviously it was the corporation that owed this money, and Mr. Jennings, to whom petitioner was explaining the corporate financial situation in connection with negotiation of the loan, was aware of this as well *281 as petitioner. There are other references to "I" with respect to the corporation in the transcript. In any event, the offer of petitioner's father created no binding obligation, either on petitioner or anyone else, to pay for the stock until after the corporate loan commitment was made and the stock was to be transferred. The testimony of both petitioner and his attorney, Mr. Schwartz, is that at that time they stated that the corporation was the purchaser of the stock. When this testimony is considered, in light of the actions taken by petitioner and his attorney shortly after the loan closing transaction to show the stock as treasury stock, it is indicative that the corporation was the purchaser of the stock. Neither Mr. Jennings nor Mr. Steadham could directly remember what was stated in connection with the arranging for and the closing of the loan. On the basis of this record as a whole, we conclude that prior to the final closing of the loan and any obligation arising for anyone to purchase petitioner's father's stock, it was the intention of the parties that the stock be purchased by the corporation and held as treasury stock. The testimony of both Mr. Schwartz and petitioner's *282 accountant, Mr. McSwain, is that at no time when they were showing the stock as treasury stock on the corporate books did they discuss the tax situation with petitioner. Mr. Schwartz testified that when he advised petitioner to have the corporation buy the stock and hold it as treasury stock, his advice was on the basis of the money coming from the credit of the corporation and the treasury stock being available to show as an asset on the corporate books. He testified that his advice was not because of any knowledge of a different tax situation. Considering the record as a whole, we conclude that the obligation to purchase the stock was that of the corporation, and in fact, the stock was purchased by the corporation. Therefore, no obligation of petitioner was paid by the corporation in connection with the stock purchase and the $60,000 used to purchase the stock did not constitute a distribution to petitioner, and petitioner received no dividend from the corporation in this amount. Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here involved. Both parties agree that if the issue which was litigated is decided in favor of petitioner there is no deficiency in tax for the year 1973 and therefore no addition to tax for that year.↩
*. Balance of loan proceeds to be disbursed upon receipt by Bank of borrower's attorney's written opinion that Bank has First Security position in all collateral.
The undersigned acknowledge receipt of a copy of this statement, agree to the correctness hereof and authorize disbursement in accordance with its terms.↩