STATE PIPE & NIPPLE CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HENRY KRONHAUS and ELEANOR KRONHAUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
State Pipe & Nipple Corp. v. Commissioner
Docket Nos. 2668-80, 2669-80.
United States Tax Court
T.C. Memo 1983-339; 1983 Tax Ct. Memo LEXIS 450; 46 T.C.M. (CCH) 415; T.C.M. (RIA) 83339; June 9, 1983. Michael V. Sterlacci and Paul Friedman, for the petitioner in docket No. 2668-80. Michael V. Sterlacci and Rebecca S. Rudnick, for the petitioners in docket No. 2669-80. Lewis R. Mandel, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Petitioners
Year
Deficiency
2668-80
State Pipe & Nipple Corp.
9/30/76
$1,296.00
9/30/77
1,452.00
2669-80
Henry Kronhaus and
12/31/75
9,518.96
Eleanor Kronhaus
12/31/76
14,202.12
12/31/77
10,819.79
This issues for decision are 1) whether payments made by petitioner State Pipe & Nipple Corp. to the Estate of Morris Masin for the *451 purpose of acquiring the estate's stock in State Pipe & Nipple Corp. constituted constructive dividends to petitioner Henry Kronhaus in his taxable years 1975, 1976 and 1977, and 2) whether State Pipe & Nipple Corp. is entitled to interest deductions in its fiscal years ending September 30, 1976, and September 30, 1977, for payments it made to the Estate of Morris Masin in connection with said transaction. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioner State Pipe & Nipple Corp. ("State Pipe") is a New York corporation whose principal place of business was at Brooklyn, New York, at the time it filed its petition. Petitioners Henry Kronhaus ("Kronhaus") and Eleanor Kronhaus, husband and wife, resided at Roslyn, New York, at the time they filed their petition. State Pipe was incorporated on October 4, 1934. During the years in issue it engaged in the design and manufacture of parts such as tubing and wire parts for the lighting lamp industries. It also engaged in designing and manufacturing occasional metal furnishings; e.g., magazine baskets and tea carts. *452 For several years prior to May 13, 1972, 30 of State Pipe's 60 outstanding shares of common stock were owned by Morris Masin ("Masin") and the remaining 30 shares were owned by Kronhaus. On May 13, 1972, Masin was president of State Pipe and Kronhaus was treasurer of State Pipe. Kronhaus was a high school graduate. He began working for State Pipe in 1940 or 1941 at the age of 18.Immediately prior to Masin's death, Kronhaus' principal responsibilities in the corporation were overseeing the operation of the factory and working on product design. At that time Masin's responsibilities principally involved handling corporate financial matters and running the corporate offices. The two men were in almost daily consultation as to all corporate actions and, consequently, did not bother to observe many corporate formalities such as formal stockholders meetings or meetings of the Board of Directors. Masin died on May 13, 1972. After his death, the following individuals were appointed executors of Masin's estate: Albert Wigutoff ("Wigutoff") (Masin's son-in-law who worked at U.S. Brass, a corporation owned by Masin and located in the same building as State Pipe), Frances Wigutoff *453 (Wigutoff's wife and Masin's daughter--the principal beneficiary of Masin's estate), Edwin Wigutoff (Wigutoff's son) and Laura Tarlowe (Wigutoff's daughter). Gilbert Levy ("Levy") is a certified public accountant who for many years did the accounting work and tax returns for Masin, State Pipe and other companies Masin owned. On Masin's death, Levy became the accountant for Masin's estate. Levy also prepares Kronhaus' income tax returns. For purposes of the Federal estate tax return of Masin's estate (filed on April 23, 1973 [1]), Levy valued Masin's 30 shares in State Pipe at $146,072.67 on the date of death. At the time of Masin's death there existed o written or oral agreement among Masin, Kronhaus and State Pipe; between Masin and Kronhaus; between Masin and State Pipe; or between Kronhaus and State Pipe with respect to the disposition of Kronhaus' and/or Masin's 50 percent *454 ownership interest of the common stock of State Pipe in the event of the death, incapacity or termination of employment of either Kronhaus or Masin.
At the time of Masin's death, Wigutoff was in very bad health and physically weak. He and his wife did not wish to continue in the business of State Pipe. At some point, Wigutoff informed Kronhaus that the estate wished to sell its shares in the company. Wigutoff recommended that Kronhaus look for an outside buyer to purchase the shares to assist Kronhaus in the future operation of State Pipe. No outside buyer, however, could then be located. At some later point, Wigutoff and Kronhaus entered into discussions concerning how the estate could dispose of its shares in State Pipe without an outside buyer. At the time, Kronhaus did not have sufficient funds of his own to purchase the shares and he communicated this fact to Wigutoff. Wigutoff and Kronhaus then orally agreed that the estate's shares would be "sold" to the corporation--i.e., redeemed--for $150,000. Levy was consulted as to how much the corporation could afford to pay out per month in satisfaction of this obligation. Levy concluded that State Pipe could afford to pay *455 $2,500 per month. Levy and Wigutoff next instructed Samuel Bisgyer ("Bisgyer"), the attorney for the estate, to draw up a contract providing for State Pipe to purchase the estate's shares for $150,000, payable $2,500 a month. Bisgyer was then well into his 80's, working in a two-man law firm in Brooklyn. He was strongwilled and difficult to work with. Occasionally, Levy and Wigutoff worked around Bisgyer in handling matters concerning the estate. When Bisgyer was told of the agreement, he objected to several of its terms. First, he insisted that there be a $15,000 down payment of the purchase price. Next, he argued that the notes for the remainder of the purchase price must bear interest. Throughout the negotiations for purchase, and the signing of all documents in this transaction, Kronhaus was never represented by counsel. On May 18, 1973, Kronhaus, Levy, Wigutoff and Bisgyer met at Bisgyer's office. At this meeting, Bisgyer read aloud, line by line, the contract he had drafted to effectuate the sale of the estate's stock. Bisgyer's contract unambiguously provided for the purchase of the estate's 30 State Pipe shares by Kronhaus for $150,000. Payment terms were *456 to be $15,000 in cash on June 1, 1973, plus $135,000 in 54 promissory notes of $2,500 each. The notes were payable monthly consecutively beginning July 1, 1973, and bore interest at six percent. Levy was named escrow agent for the stock which was to be delivered to Levy at the closing on June 1, 1973. Paragraph 8 of the contract stated: "This Agreement shall bind the respective parties hereto, and each of their heirs, executors, administrators and assigns." As the contract was read aloud, Levy interrupted Bisgyer to object that State Pipe, and not Kronhaus, was supposed to be the buyer. Wigutoff made a similar objection. Bisgyer replied, "Let it ride," and assured the parties that there was an assignment clause in the contract (paragraph 8) for changing anything they wanted. Levy did not question Bisgyer's statement, and the reading of the contract continued. Kronhaus next learned of the $15,000 down payment and the six percent interest on the unpaid balance of the purchase price. After more discussion, Kronhaus acquiesced in these new terms of the deal. After the reading, Kronhaus and Wigutoff signed the contract. The signatures of the other three executors of Masin's *457 estate were added between May 19, 1973, and May 29, 1973. After Kronhaus signed the contract, and before June 1, 1973, Levy and Kronhaus discussed how the initial $15,000 cash payment should be made. Levy told Kronhaus that State Pipe was heading into its slack summer period and that its cash position was insufficient to enable it to pay $15,000 on June 1, 1973. Levy suggested that Kronhaus make the down payment on the contract out of his own personal funds as an advance to State Pipe. Levy told Kronhaus that in the event an outside buyer could be found to purchase the 30 shares formerly owned by the estate from State Pipe, Kronhaus could use the $15,000 advance to purchase one or two of these State Pipe shares. This, Levy explained, would leave Kronhaus with a voting majority interest in State Pipe, as opposed to his present 50 percent interest. Levy also discussed with Kronhaus at this time how the contract could be changed to indicate that State Pipe was the buyer. Rather than work through Bisgyer, Levy suggested that Kronhaus go ahead with the June 1, 1973, closing as written, but before the first $2,500 payment was due Levy would have his own personal attorney draw up *458 an assignment of the contract to State Pipe. On June 1, 1973, Levy, Kronhaus, Wigutoff and Bisgyer again met in Bisgyer's office. At that meeting, 1) Wigutoff delivered the estate's 30 shares to Levy as escrow agent, 2) Kronhaus was presented with and signed 54 promissory notes (each in the amount of $2,500) using his own name, i.e., nowhere indicating that he was signing as a corporate officer or agent of State Pipe and 3) Kronhaus delivered to the estate a $15,000 cashier's check drawn from his personal savings. On June 30, 1973, Kronhaus signed the following document prepared by Levy's personal attorney: ADDENDUM TO AGREEMENT BETWEEN EXECUTORS UNDER LAST WILL AND TESTAMENT OF MORRIS MASIN, DECEASED, (Sellers) and HENRY KRONHAUS (Buyer).
PURSUANT to, and in accordance with the provisions of Paragraph numbered "8" of the Agreement concerning the sale by the Executors of the ESTATE OF MORRIS MASIN of Fifteen (15) shares of stock of STATE PIPE AND NIPPLE COMPANY, a Corporation, to HENRY KRONHAUS, as Buyer, the undersigned hereby and herewith assigns all of his right, title and interest in and to said Agreement to STATE PIPE AND NIPPLE CORPORATION. The reference in *459 this document to the sale of 15 shares, when in fact 30 shares were transferred, was an error resulting from Levy's confusion regarding how many shares of State Pipe were then outstanding. No individual representing the estate signed this document. Beginning with the payment of the first $2,500 promissory note on July 1, 1973, State Pipe made all of the principal payments (in the total amount of $135,000) and all of the interest payments on the installment obligations given to the estate as a result of its disposition of the 30 shares of State Pipe stock. Payments on the monthly notes were occasionally accelerated or delayed depending on State Pipe's financial condition on the due date. During the calendar years 1975 through 1977, State Pipe made the following payments to the estate on the installment obligations: 1975
1976
1977
Principal
$20,000
$25,000
$20,000
Interest
4,925
3,163
2,050
Total
$24,925
$28,163
$22,050
Kronhaus and his wife did not report any of these payments as constructive dividends on their joint returns for these years. During its fiscal years ended September 30, 1976, and September 30, 1977, State Pipe deducted *460 on its income tax returns interest paid to the estate in the amounts of $2,700 and $3,025, respectively. The 30 shares of State Pipe disposed of by the estate were never registered by Levy to Kronhaus on the corporation's stock record book. Levy treated the shares as treasury stock on the corporation's income tax returns during its fiscal years ending September 30, 1976, and September 30, 1977, but not September 30, 1973.
Balance sheets attached to the corporation's income tax returns for the fiscal years ending September 30, 1976, and September 30, 1977, reflect an outstanding stockholder loan of $15,000 at the beginning of each fiscal year. No outstanding stockholder loan appears on the corporation's income tax return for the fiscal year ending September 30, 1973. At the time of the trial herein, Wigutoff and Bisgyer were deceased. OPINION "Every schoolboy knows" [2] that the redemption of the stock of a 50 percent shareholder produces no tax liability in the other 50 percent shareholder when the latter is under no obligation to purchase the former's stock. Holsey v. Commissioner,258 F.2d 865 (3d Cir. 1958), *461 revg. 28 T.C. 962 (1957); Priester v. Commissioner,38 T.C. 316 (1962). On the otherhand, if one 50 percent shareholder is obligated to purchase the stock of the other, the redemption of the latter's stock produces a constructive dividend to the former. SeeJacobs v. Commissioner,698 F.2d 850 (9th Cir. 1983), affg. per curiam a Memorandum Opinion of this Court; Television Industries, Inc. v. Commissioner,284 F.2d 322 (2d Cir. 1960), affg. 32 T.C. 1297 (1959); Wall v. United States,164 F.2d 462 (4th Cir. 1947); Yelencsics v. Commissioner,74 T.C. 1513 (1980). What every schoolboy does not know is where to draw a bright line between a stock redemption and constructive dividend where the parties to the transaction have acted inconsistently. Drawing the line is our task in this case. Respondent determined that on May 18, 1973, Kronhaus personally obligated himself to purchase 30 shares of State Pipe from the estate of Morris *462 Masin. During the calendar years 1975, 1976 and 1977, State Pipe made all payments of interest and principal on the installment obligations arising out of the May 18, 1973, transaction. Accordingly, respondent concluded that these payments were constructive dividends to Kronhaus in those years. Respondent further determined that any interest payments made by State Pipe on the installment obligations during its fiscal years ending September 30, 1976, and September 30, 1977, are not deductible by the corporation because they are interest payments on the debt of another, i.e., Kronhaus. SeeEnoch v. Commissioner,57 T.C. 781, 794 (1972). Petitioners dispute respondent's factual premise. Specifically, petitioners contend that Kronhaus never personally intended to obligate himself to purchase the State Pipe shares held by Masin's estate. Petitioners argue that at all times the corporation was the purchaser of the estate's shares and that any documents indicating otherwise are erroneous. Petitioners argue that the May 18, 1973, document on which respondent principally relies was a product of mutual mistake or scrivener's error and would be set aside under New York *463 law. Alternatively, petitioners contend that Kronhaus purchased the shares as an agent of the corporation, never becoming personally liable for the purchase. The factual issue we must decide, therefore, is whether Kronhaus was primarily and unconditionally obligated to purchase the estate's shares at the time State Pipe made the payments on the installment obligations. Jacobs v. Commissioner,supra at 852. It has often been said by this Court that when the parties to an agreement have clearly and unambiguously set out the terms of their agreement, the taxpayer must adduce strong proof to demonstrate that the true agreement of the parties was other than the language of the written agreement. Stephens v. Commissioner,60 T.C. 1004, 1012 (1973), affd. without opinion 506 F.2d 1400 (6th Cir. 1974). [3] A taxpayer will not be bound even by an unambiguous agreement, though, when the form of his transaction does not comport with its substance. Bennett v. Commissioner,58 T.C. 381 (1972); Ciaio v. Commissioner,47 T.C. 447, 457 (1967). *464 [4]
In the instant case, the document signed by Kronhaus on May 18, 1973, unambiguously provides for Kronhaus to be the buyer of the State Pipe stock from Masin's estate. Additionally, the signatures on the 54 promissory notes signed by Kronhaus on June 1, 1973, do not indicate that Kronhaus was acting in a corporate capacity or as agent for the corporation. Under these circumstances, we think petitioners are required to adduce strong proof that Kronhaus was not in fact the buyer of the State Pipe stock under the agreement of the parties. At this point, we must discuss two evidentiary problems. The first is the parol evidence rule. Respondent argues that petitioners may not introduce parol evidence to vary the terms of the May 18, 1973, document. We disagree. Respondent's objection to our receiving any parol evidence with regard to the documents herein is clearly both too broad and an attempt to bootstrap us into applying the Danielson rule to the facts of this case. SeeCommissioner v. Danielson,378 F.2d 771 (3rd Cir. 1967), revg. 44 T.C. 549 (1965), and *465 discussion at footnote 3, supra.Even under the Danielson rule, parol evidence is admissible in a tax proceeding to vary the terms of an unambiguous contract if such evidence tends to prove mutual mistake or some other exception to the parol evidence rule which would allow the parties to a contract under state law to avoid or modify the agreement. The testimony of Levy and Kronhaus, to the extent it was directed at showing mutual mistake, was thus admissible under any standard of proof. SeeGordon v. Commissioner,T.C. Memo. 1975-86; Nichols v. Commissioner,T.C. Memo. 1973-114. Cf. Estate of Craft v. Commissioner,68 T.C. 249 (1977), affd. 608 F.2d 240 (5th Cir. 1979). Often, in cases such as the instant one, this Court has admitted testimony and documentary evidence regarding the contracting parties' intentions in spite of the clear language of the contract at variance with such testimony. See, e.g., Bennett v. Commissioner,supra;Ciaio v. Commissioner,supra. Accordingly, *466 the parol evidence offered herein is admissible. Whether the parol evidence is considered sufficiently corroborated by other evidence in the record to meet the taxpayer's burden of proof is a wholly distinct issue. And we are mindful of the fact that a taxpayer should not be permitted to override the words of his contract merely by introducing uncorroborated contrary parol evidence. SeeDeshotels v. United States,450 F.2d 961, 967 (5th Cir. 1971). The second evidentiary question involves hearsay objections to Levy and Kronhaus' testimony regarding the out-of-court statements of Wigutoff and Bisgyer. Wigutoff and Bisgyer both died prior to the trial herein. Although respondent's objection was raised as a continuing one, it would appear that the alleged hearsay statements to which respondent most objects are 1) Kronhaus' testimony as to the terms of the oral contract he reached with Wigutoff prior to May 18, 1973, 2) Kronhaus and Levy's testimony that Wigutoff objected at the May 18, 1973, meeting to Bisgyer's naming Kronhaus and not State Pipe as the buyer and 3) Kronhaus and Levy's testimony as to Bisgyer's response to Levy and Wigutoff's objection at the May 18, 1973, meeting. *467 The hearsay rule forbids evidence of out-of-court statements to prove the facts asserted in those statements. Rule 801(c), Federal Rules of Evidence.An out-of-court statement constituting a verbal act, however, is not hearsay. See Advisory Committee's Notes to Rule 801 quoted in S. Saltzburg and K. Redden, Federal Rules of Evidence Manual 551 (3rd ed. 1982); 6 Wigmore, Evidence sec. 1772 (Chadbourn rev. 1976); McCormick on Evidence sec. 249 (2d ed. 1972). It is well settled that testimony relating an out-of-court declarant's offer or acceptance of a contract is not hearsay. N.L.R.B. V. H. Koch & Sons,578 F.2d 1287 (9th Cir. 1978); Creaghe v. Iowa Home Mutual Casualty Co.323 F.2d 981, 984-985 (10th Cir. 1963), and cases cited therein; 6 Wigmore, supra sec. 1770; McCormick, supra sec. 249. Accordingly, Kronhaus' testimony regarding the oral agreement he reached with Wigutoff prior to May 18, 1973, providing for State Pipe's purchase of the estate's shares *468 is not hearsay and is admissible. Similarly, testimony regarding Wigutoff's objection at the May 18, 1973, meeting to Bisgyer's naming Kronhaus as the buyer is admissible either 1) as a renewed offer of contract to State Pipe or 2) to show Wigutoff's then intention to sell the estate's shares to State Pipe (See Rule 803(3), Federal Rules of Evidence), though such testimony is not admissible to show the terms of any prior agreement Wigutoff had made with Kronhaus (see Prather v. Prather,650 F.2d 88 (5th Cir. 1981)). Finally, the testimony concerning Bisgyer's response to Wigutoff and Levy's objections at the May 18, 1973, meeting is admissible because it is not being introduced to prove the truth of what Bisgyer said. Rather it is being introduced to show the effect it had on Wigutoff and Kronhaus in causing them to sign an agreement which, if Kronhaus' prior testimony is believed, was not the agreement of the parties to the contract. See McCormick, supra sec. 249. If Bisgyer's statements lulled Wigutoff and Kronhaus into a belief that they could sign the document but that State Pipe would still be the buyer and the discrepancy in the contract could be *469 altered later, this fact is highly relevant in our inquiry as to whether the parties ever considered Kronhaus primarily liable for the purchase price. [5]
Turning to the substantive issue, we hold that petitioners have adduced sufficiently strong proof to show that Kronhaus was never personally liable for the purchase of State Pipe's shares from Masin's estate. The testimony of Kronhaus and Levy reveals that initially Kronhaus, on behalf of State Pipe, and Wigutoff, on behalf of the estate, orally agreed that State Pipe would "buy"--in actuality, redeem--the estate's shares. Levy was then consulted regarding how much money State Pipe could afford to pay each month out of working capital to consummate the redemption. Levy and Wigutoff next asked Bisgyer to draft a contract along these agreed lines, but instead Bisgyer presented Kronhaus, Levy and Wigutoff on May 18, 1973, with a contract naming Kronhaus as buyer. When the contract was read aloud, Levy and Wigutoff objected to naming Kronhaus as the buyer. The testimony of Levy and Kronhaus was clear, convincing and uncontroverted that Bisgyer was elderly *470 and obdurate, and that at the reading of the contract he impatiently brushed aside all objections by stating there was a provision in his draft of the contract allowing the parties to change anything they wanted to later on. As a consequence Wigutoff and Levy refrained from further demurrers and acquiesced in the contract as Bisgyer had drafted it. On June 1, 1973, Kronhaus signed the promissory notes called for under the contract as drawn. In addition, Kronhaus personally made the $15,000 cash down payment because State Pipe could not then afford such a large payment. On June 30, 1973, though, Kronhaus unilaterally executed an "addendum" to the contract assigning his apparent rights to purchase the estate's shares to State Pipe. Thereafter, State Pipe made all further payments under the contract. Despite their obvious interests in this matter, we found Kronhaus and Levy's testimony to be entirely credible and consistent with the documentary evidence and other undisputed facts herein.Contrast Stephens v. Commissioner,supra. As we view the evidence, Kronhaus and Wigutoff signed the May 18, 1973, contract (and Kronhaus signed the June 1, 1973, notes) *471 under the impression that Kronhaus would not be personally liable for the amounts due under the contract. The actual alteration of the terms of the contract would be handled later, without Bisgyer's participation. As the relevant dates indicate, this was promptly accomplished. To the extent Kronhaus signed the contract and notes using his own name, we believe he acted as the agent or conduit for the corporation in a single, integrated transaction. Fox v. Harrison,145 F.2d 521 (7th Cir. 1944); Bennett v. Commissioner,supra at 388; Ciaio v. Commissioner,supra.
That Kronhaus was never to be personally liable for the purchase of the estate's shares is also evident from the fact that Kronhaus did not have sufficient funds of his own to pay the $150,000 purchase price in 1973 and Wigutoff knew this. SeeBennett v. Commissioner,supra at 386. In addition, the estate was content to receive the $135,000 in deferred payments for the shares in circumstances tailored to the financial health of State Pipe. The estate did not look to Kronhaus as primary obligor when payments on the notes occasionally became *472 overdue. In sum, circumstantial evidence corroborates the testimony that Kronhaus assumed no personal liability in the disputed transaction. Respondent raises several arguments in an attempt to refute petitioners' evidence. First, respondent contends that Bisgyer wanted to hold Kronhaus personally liable for the amount due the estate in the event State Pipe could not pay all the notes. This is mere speculation by respondent, however, and in any event Bisgyer was only an attorney for the estate, not a party to the contract. It is Wigutoff's intentions, as the executor who negotiated the deal, that are relevant herein. SeeBennett v. Commissioner,supra;Ciaio v. Commissioner,supra.
Second, respondent argues that since Kronhaus was willing to accede to Bisgyer's demands for a $15,000 down payment and payment of interest on the unpaid balance of the purchase price, we should assume Kronhaus in signing the contract acceded to Bisgyer's desire that Kronhaus be the buyer. We disagree. Concession on some issues does not imply concession on all issues. Quite the contrary, we believe Kronhaus' preparation and signing of an "addendum" *473 to the contract (albeit unilateral) only a few weeks after signing the contract shows that Kronhaus did not wish to accede to Bisgyer's naming him the buyer, regardless of the legal efficacy of this "addenbum." Third, respondent argues that the addendum assigns to State Pipe only 15 of the 30 shares Kronhaus purchased from State Pipe. Respondent contends Kronhaus retained 45 of the 60 authorized shares of State Pipe so that if an outside buyer for the estate's shares could be found, Kronhaus would then hold a 75 percent interest in the corporation.Respondent, however, misreads the addendum. In the addendum, Kronhaus assigns all his apparent right title and interest in the May 18, 1973, agreement to State Pipe. The addendum's reference to the "Agreement concerning the sale by the Executors of the ESTATE OF MORRIS MASIN of Fifteen (15) shares of stock of STATE PIPE AND NIPPLE COMPANY, a Corporation, to HENRY KRONHAUS" is obviously an error because there never was an agreement merely for the sale of 15 shares. Levy explained that this error came about as a result of his confusion regarding the number of State Pipe shares outstanding. Finally, respondent contends that up to *474 at least June 1, 1973, Kronhaus was content with being the purchaser of the estate's State Pipe shares and that only sometime around June 30, 1973, did Kronhaus and Levy hatch the idea of an assignment. As evidence for this, respondent notes that initially State Pipe's books did not show the $15,000 down payment Kronhaus made on June 1, 1973, as a loan from shareholders. It is our conclusion, however, that the addendum must be read as part of one badly-documented integrated transaction.We do not feel that this is a case where the parties changed their minds after the fact and then attempted to reform the transaction. In addition, the mere fact that the corporate books may not initially have shown the $15,000 down payment as an advance is not, we think, particularly determinative. The balance sheets on State Pipe's income tax returns for the fiscal years ending September 30, 1976, and September 30, 1977, show a $15,000 loan from stockholders as of October 1, 1975, and October 1, 1976. There is no evidence here that the $15,000 advance shown on these balance sheets only mysteriously appeared after an audit began. SeeMozert v. Commissioner,T.C. Memo. 1979-263. *475 In conclusion, we hold that Kronhaus never became personally liable for the purchase of the estate's State Pipe shares but rather that State Pipe was at all times primarily liable for the payments to redeem these shares. Fox v. Harrison,supra;Bennett v. Commissioner,supra;Ciaio v. Commissioner,supra. Consequently, we hold that Kronhaus realized no constructive dividend from the corporation's payments to the estate in 1975, 1976 and 1977 and that State Pipe's interest payments on the unpaid balance of the amount due to the estate are properly deductible by State Pipe in its fiscal years ending September 30, 1976, and September 30, 1977. Decisions will be entered for the petitioners.
Footnotes
1. Paragraph 13 of the stipulation gives this date as April 23, 1972. This is clearly an error. Masin did not die till May 13, 1972. At trial Levy testified that the estate tax return was filed in April, 1973. Accordingly, we have merely substituted "1973" for "1972" in the stipulated date.↩
2. "Every schoolboy knows who imprisoned Montezuma, and who strangled Atahualpa." Thomas Babington, Lord Macaulay, On Lord Clive (1840).↩ 3. Respondent would prefer that we apply the even more strict standard of proof of Commission v. Danielson [67-1 USTC ¶ 9423], 378 F.2d 771 (3rd Cir. 1967), revg. [Dec. 27,476] 44 T.C. 549 (1965); namely, that a party can challenge the tax consequences of his agreement as construed by the respondent only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. Respondent recognizes, however, that under Golsen v. Commissioner [Dec. 30,049], 54 T.C. 742 (1970), affd. [71-2 USTC ¶ 9497] 445 F.2d 985 (10th Cir. 1971), we are obliged to follow the "strong proof" rule as adopted by the Second Circuit (where venue on appeal in this case lies). Ullman v. Commissioner [59-1 USTC ¶ 9314], 264 F.2d 305, 308 (2nd Cir. 1959), affg. [Dec. 22,637] 29 T.C. 129↩ (1957),
4. See also Roy v. Commissioner,T.C. Memo. 1968-99↩.
5. SeeRevzin v. Commissioner,T.C. Memo. 1977-68↩.